**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF ILLINOIS, STATE OF ILLINOIS DEPARTMENT OF TRANSPORTATION, and CITY OF CHICAGO *ex rel.* ANGELO MILAZZO, | No. 17-cv-3062 |
| Plaintiff-Relator, v. | Judge John J. Tharp, Jr. |
| JOEL KENNEDY CONSTRUCTING CORP., JOEL W. KENNEDY, *et al.*, | |
| Defendants. | **Jury Trial Demanded** |

## AMENDED COMPLAINT

NOW COMES the UNITED STATES OF AMERICA, STATE OF ILLINOIS, STATE OF ILLINOIS DEPARTMENT OF TRANSPORTATION, and the CITY OF CHICAGO, *ex rel.* ANGELO MILAZZO, by and through their undersigned attorneys, Loevy & Loevy, and complaining of Defendants JOEL KENNEDY CONSTRUCTING CORP., JOEL KENNEDY, MARTINEZ UNDERGROUND, INC., BARRERA CONSTRUCTION, INC., JLA & SONS CONSTRUCTION COMPANY, E. KING CONSTRUCTION CO., INC., ORIENT EXPRESS SERVICE COMPANY, INC., MIDWEST REM ENTERPRISES, INC., CHICAGOLAND TRUCKIN INC., and MENINI CARTAGE, INC., states as follows:

### Background

1.      This action seeks damages and civil penalties arising from violations of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, the Illinois False Claims Act, 740 ILCS 175/1, *et seq.*, and the Chicago False Claims Ordinance, MCC § 1-22-010, *et seq.*

2.      Defendants engaged in numerous fraudulent schemes with respect to their work on

water and sewer contracts with the City of Chicago ("City") and the Illinois Department of Transportation.

3. One of their main fraudulent schemes involved the refusal of Joel Kennedy Constructing Corp. ("JKCC") to follow the contractual requirement that 50% of all labor be performed by Chicago residents, a requirement commonly referred to as a residency requirement.

4. When it sought out the contracts at issue, JKCC intended to ignore the residency requirements, and it did in fact ignore those requirements while working on the contracts.

5. JKCC was able to evade detection by falsely certifying to the City that JKCC was using City residents to perform at least 50% of the work when it was not doing so. JKCC's actions on the contracts at issue were consistent with its approximately 20-year pattern of ignoring residency requirements.

6. JKCC also engaged in numerous schemes with Minority Business Enterprises ("MBEs"), companies that are owned and run by individuals of minority backgrounds, and Women Business Enterprises ("WBEs"), companies that are owned and run by women, to secure contracts with the City.

7. In addition, JKCC fraudulently utilized Disadvantaged Business Enterprises ("DBEs"), companies where at least 51% of the ownership interest is held by a member of an economically or socially disadvantaged group, to secure contracts with the Illinois Department of Transportation.

8. Namely, JKCC claimed to allocate a certain amount of contract dollars to the MBEs, WBEs, and DBEs when in reality the MBEs, WBEs, and DBEs functioned merely as "pass-through" companies, with JKCC performing the work.

2

9. Finally, on one contract, JKCC chose to use a cheaper backfill material in place of the more expensive backfill material that the contract expressly required.

**Parties**

10. Relator Angelo Milazzo ("Relator") worked for JKCC starting in 1987 and served in various positions, including corporate secretary, until 2011. Relator Milazzo was a 10% shareholder in JKCC until 2011. On city projects, he served as the liaison officer for compliance with MBE and WBE contract requirements. Relator has direct and independent knowledge of the frauds committed by the Defendants. By virtue of his position with JKCC, Relator was intimately aware of the schemes and frauds engaged in by JKCC. Relator left JKCC in October 2015.

11. Defendant JKCC is a privately held company located at 40 Noll Drive in Waukegan, Illinois. It was established in 1982 and is incorporated under the laws of the state of Illinois.

12. Joel Kennedy is the President of JKCC, a position he has held since in or around 1982. Joel Kennedy owns 100% of JKCC.

13. Defendant Martinez Underground, Inc. ("Martinez Underground") is a privately held company located at 12 Galleon Court in Grayslake, Illinois. It was established in 2000 and is incorporated under the laws of the State of Illinois. Adolfo C. Martinez of Grayslake, Illinois is the President of Martinez Underground.

14. Defendant Barrera Construction, Inc. ("Barrera Construction") is a privately held company located at 238 Red Oak Court in West Chicago, Illinois. It was established in 1983 and is incorporated under the laws of the State of Illinois. Jose L. Barrera of West Chicago, Illinois is the President of Barrera Construction.

15.     Defendant JLA & Sons Construction Company ("JLA & Sons") is a privately held company located at 36760 North Boulevard View Avenue in Waukegan, Illinois. It was established in 2005 and is incorporated under the laws of the State of Illinois. Jose L. Arreola of Waukegan, Illinois is the President of JLA & Sons.

16.     Defendant E. King Construction Co., Inc. ("E. King") is a privately held company located in Chicago, Illinois. It was established in 1999 and is incorporated under the laws of the State of Illinois. Elaine King, a resident of Chicago, Illinois, is the President of E. King.

17.     Defendant Orient Express Service Company, Inc. ("Orient Express") is a privately held company located in Wauconda, Illinois. It was established in 1986 and is incorporated under the laws of the State of Illinois. Takyung Lee, a resident of Wauconda, Illinois, is the President of Orient Express.

18.     Defendant Midwest REM Enterprises, Inc. ("Midwest REM") is a privately held company located in Melrose Park, Illinois. It was established in 1992 and is incorporated under the laws of the State of Illinois. Albert Ramirez, a resident of Winfield, Illinois, is the President of Midwest REM.

19.     Defendant Chicagoland Truckin Inc. ("Chicagoland Truckin") is a privately held company located in Chicago, Illinois. It was established in 2002 and is incorporated under the laws of the state of Illinois. Alberto Roman, a resident of Oak Park, Illinois, is the President of Chicagoland Truckin.

20.     Defendant Menini Cartage, Inc. ("Menini Cartage") is a privately held company located in Schaumburg, Illinois. It was established in 1966 and is incorporated under the laws of

the State of Illinois. Linda Menini, a resident of Mount Prospect, Illinois, is the President of Menini Cartage.

## Jurisdiction and Venue

21.     The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1367 and 31 U.S.C. § 3730. The state and municipal law claims are transactionally related to the federal claims Relator brings on behalf of the government. The allegations and transactions upon which this action is based have not been publicly disclosed. Relator also has direct and independent knowledge of the information on which the allegations are based and voluntarily provided this information to the government before filing suit.

22.     Venue is proper pursuant to 31 U.S.C. § 3732. All Defendants transact business in this judicial district and the claims are based on events that occurred in this judicial district. Moreover, most if not all of the Defendants reside and/or maintain their principal place of business here.

## Overview of Contracts

23.     There are at least six contracts with the City of Chicago at issue in this lawsuit:

a.  JKCC Project/Job No. 1141, Contract (PO) Number 19367, Specification Number 68904, is a contract between JKCC and the City of Chicago Department of Water Management entitled "Private Drain Repair – North Area/DWM Project 6220A," which was awarded on or around March 3, 2009, and was set to end on or around March 3, 2011, but was extended for at least another year. (Dkt. No. 45-1). The final contract value was more than $8,000,000. To secure the contract, JKCC falsely certified that 24% of the total

work on the contract would be performed by MBEs and that 4% of the total work on the contract would be performed by WBEs. (Dkt. No. 45-1 at pp. 230-231). This contract also included a requirement that at least 50% of the labor be performed by City residents. As detailed below, JKCC did not intend to comply with the MBE/WBE requirements or the residency requirements, and it did not in fact comply with these requirements.

b.  JKCC Project/Job No. 1154, Contract (PO) Number 26407, Specification Number 104069, is a contract between JKCC and the City of Chicago Department of Water Management entitled "North District Water Construction," which was awarded on or around May 10, 2012, and ended on or around February 3, 2013. (Dkt. No. 45-2). The final contract value was more than $26,400,000. With regard to MBE and WBE participation, JKCC certified in the contract that approximately 24% of the total work would be performed by MBEs and that approximately 4% would be performed by WBEs. (Dkt. No. 45-2 at p. 282). This contract also included a requirement that at least 50% of the labor be performed by City residents. As detailed below, JKCC did not intend to comply with the MBE/WBE requirements or the residency requirements, and it did not in fact comply with these requirements.

c.  JKCC Project/Job No. 1157, Contract (PO) Number 27739, Specification Number 112101, is a contract between JKCC and the City of Chicago Department of Water Management entitled "Water Main Construction – District One," which was awarded on or around January 31, 2013, and was set to end on or around January 27, 2016, but was extended through at least the end of 2016. (Dkt. No. 45-4). The final contract value

6

was more than $77,000,000. With regard to MBE and WBE participation, JKCC certified in the contract that 24% of the total work on the contract would be performed by MBEs and that 4% of the total work would be performed by WBEs. (Dkt. No. 45-4 at p. 290). This contract also included a requirement that at least 50% of the labor be performed by City residents. As detailed below, JKCC did not intend to comply with the MBE/WBE requirements or the residency requirements, and it did not in fact comply with these requirements.

d. JKCC Project/Job No. 1158, Contract (PO) Number 27738, Specification Number 112102, is a contract between JKCC and the City of Chicago Department of Water Management entitled "Water Main Construction – District Two," which was awarded on or around January 30, 2013, and was set to end on or around January 27, 2016, but was extended through at least the end of 2016. (Dkt. No. 45-3). The final contract value was more than $79,600,000. With regard to MBE and WBE participation, JKCC once again certified in the contract that 24% of the total work would be performed by MBEs and that 4% of the total work would be performed by WBEs. (Dkt. No. 45-3 at p. 294). This contract also included a requirement that at least 50% of the labor be performed by City residents. As detailed below, JKCC did not intend to comply with the MBE/WBE requirements or the residency requirements, and it did not in fact comply with these requirements.

e. JKCC Project/Job No. 1159, Contract (PO) Number 28325, Specification Number 115457, is a contract between JKCC and the City of Chicago Department of Water Management entitled "Damen Avenue Sewer Improvement – N. Damen Ave & W.

Albion Ave.," which was awarded on or around July 24, 2013 and ended on or around July 27, 2017. (Dkt. No. 45-5). The final contract value was more than $4,000,000. With regard to MBE and WBE participation, JKCC certified in the contract that approximately 24% of the total work would be performed by MBEs and that approximately 4% of the total work would be performed by WBEs. (Dkt. No. 45-5 at p. 248). This contract also included a requirement that at least 50% of the labor be performed by City residents. As detailed below, JKCC did not intend to comply with the MBE/WBE requirements or the residency requirements, and it did not in fact comply with these requirements.

f.  Contract (PO) Number 43252, Specification Number 127995, is a contract between JKCC and the City of Chicago Department of Water Management entitled "Augusta Boulevard Sewer Improvement," which was awarded on or around October 19, 2016, and ended on or around February 13, 2018. (Dkt. No. 45-6). This contract is federally funded with money allocated by the United States Department of Housing and Urban Development. The final contract value was more than $1,900,000. With regard to MBE and WBE participation, JKCC certified in the contract that 24.04% of the total work would be performed by MBEs and that 4.02% of the total work would be performed by WBEs. (Dkt. No. 45-6 at p. 230). This contract also included a requirement that at least 50% of the labor be performed by City residents. Upon information and belief, including the fact that the long-standing schemes alleged in this complaint continued unabated through the end of Mr. Milazzo's tenure with JKCC in October 2015, and the fact that JKCC identified the same MBE and WBE subcontractors on this contract as

on the contracts JKCC carried out while Mr. Milazzo worked for the company, JKCC did not intend to comply with the MBE/WBE requirements or the residency requirement, and it did not in fact comply with these requirements.

24.     There is at least one contract with the Illinois Department of Transportation ("IDOT") at issue in this lawsuit. JKCC Project/Job No. 1152, Contract Number 60F90, Job C-91-287-09, entitled "Storm Sewer Installation at I-190/I-294 (Tri-State Tollway). From the Canadian National Railroad to the Des Plaines River in Chicago and Rosemont" (Exhibit A). JKCC's DBE Utilization plan for the contract was approved on December 16, 2011, shortly before the contract was awarded. This contract has a term of March 2012 until October 2013. The contract was scheduled for "Final Inspection" to take place on October 25, 2013. The "Contractors Payment Information" for the contract indicates that final payment on the contract was made on April 28, 2014. The original contract awarded amount was $9,397,519, with a final adjusted value of $9,716,806.23. In obtaining approval of the DBE Utilization Plan and securing the contract, JKCC certified that it would have a 23% DBE participation rate on the contract. As detailed below, JKCC made that certification to attain this contract knowing it was false and that JKCC had no intent of complying with the DBE plan and other requirements under the contract. Nor did JKCC comply.

**JKCC's Residency Requirement Fraud**

25.     All of JKCC's contracts with the City of Chicago require that at least 50% of all labor be performed by Chicago residents.

26. The City uses residency requirements in many areas of City government, and the requirements serve important social goals for the City, including that City residents have the opportunity to work on projects commissioned and funded by the City.

27. Indeed, the City takes residency requirements so seriously that it routinely fires City employees who violate those policies.

28. JKCC was required to certify that it complied with the City's residency requirements.

29. Namely, the City required JKCC to provide certified payroll documentation that included address information to allow the City to ensure that contractors such as JKCC were following the City's residency requirements.

30. Among other things, JKCC was required to certify that its payroll submissions were "correct and complete."

31. The contracts at issue provided substantial penalties for failure to comply with the City's residency requirements, and the payroll certifications informed contractors such as JKCC that false submissions could subject them to prosecution.

32. Despite the clear contractual requirements, JKCC did not use Chicago residents to perform at least 50% of the work on the contracts at issue.

33. This fraud came from the top of JKCC. Specifically, Joel Kennedy, the President of JKCC, was the mastermind of the fraudulent residency scheme, was aware of the scheme (including, for example, because he personally drove workers from Waukegan to job sites in Chicago), and was even personally involved in carrying the scheme out.

34. JKCC carried out its residency fraud using two main tactics. First, JKCC routinely omitted employees who worked on projects but who did not live in Chicago from the payroll

documentation that it submitted to the City, which gave the City false information about the percentage of work being performed by City residents. Second, in other instances, JKCC submitted payroll documentation to the City with fake Chicago addresses for certain employees who did not actually reside in Chicago, again to give a false impression about the amount of work being performed by City residents.

***JKCC falsely omits employees from payroll documentation it submits to the City***

35.     JKCC carried out the first technique by keeping one set of internal payroll records and one set that it submitted to the City of Chicago.

36.     Namely, Ms. Robin Jasper, a JKCC employee and Board Member, would typically gather the payroll each week and tender it to the company's payroll provider to make sure the company's employees were paid for their work. Ms. Leonor Bond was then tasked with creating drafts of the certified payroll documentation that would ultimately be submitted to the City. JKCC Project Engineer Michael Patti, who was responsible for keeping track of the residency requirement, would tell Ms. Bond to omit certain employees who were not Chicago residents, in order to increase the percentage of Chicago residents on the payroll. Mr. Patti then took the updated, incomplete payroll documentation that lacked the names he directed Ms. Bond to remove, and he reported this incomplete information to the City.

37.     As just one example of JKCC's use of the under-reporting technique, JKCC paid 27 people for work performed on City of Chicago contracts for the week ending July 5, 2015, but it reported paying only 15 of those individuals to the City to artificially inflate the percentage of work purportedly being done by Chicago residents.

38.     JKCC routinely submitted these types of false payroll reports to the City, changing the number of workers it would leave off each payroll based on how far off the 50% requirement JKCC was.

39.     Overall, JKCC's internal payroll records contain significantly more workers than the payroll records provided to the City to hide JKCC's residency fraud.

***JKCC submits documentation to the City falsely listing Chicago addresses for non-residents***

40.     As noted above, JKCC also routinely instructed and/or worked with its employees to obtain fake Chicago addresses and then listed those fake addresses on paperwork submitted to the City.

41.     Examples of JKCC's use of false addresses to evade the residency requirement include:

- Joel Kennedy's sisters, Sherry Kennedy (a union laborer) and Kristie Kennedy (a union operator), appeared on certified payroll documents with fake Chicago addresses even though Joel Kennedy and Robin Jasper (the JKCC employee and Board Member who was responsible for submitting payroll to JKCC's payroll provider) knew the sisters personally and knew that they did not reside in Chicago. Certified payroll documents submitted to the City in or about October 2012 listed Sherry Kennedy's true address in Harvard, Illinois, but subsequent payrolls for that JKCC submitted to the City of Chicago for later projects falsely listed Sherry Kennedy as residing at a Chicago address. Direct deposit documentation also confirms that Sherry Kennedy's true address was in Harvard, Illinois. Similarly, Kristie Kennedy's true address is in Salem, Wisconsin, but she is falsely listed as residing at a Chicago address on a certified payroll provided to the City in or about June 2013.

- JKCC's payroll submitted to the City in December 2014 shows that two non-resident employees were claiming to live at the Chicago residence of JKCC Board Member, VP, and General Counsel, Paul Lubanski.

- JKCC claimed that Encente "Joe" Lozano and his son Hugo were Chicago residents, even though both lived in Waukegan. Joe Lozano was a personal friend of Joel Kennedy and worked for JKCC from 1990 until 2015, and Kennedy knew the Lozanos were not Chicago residents.

12

- JKCC employees Avery Jackson, Hugo Lozano, and Jorge Ayala were listed on documentation provided to the City as living in Chicago, whereas other documentation, including payroll documents relating to contracts for work in Lake County, Illinois, show that these individuals did not reside in Chicago.

**JKCC Fraudulently Used MBE, WBE, and DBE Companies As Pass-Through Entities**

42.     For its IDOT and City of Chicago contracts, JKCC improperly utilized companies that had been certified as MBEs, WBEs, and DBEs to serve as "pass-through" companies (hereinafter, "pass-throughs") for work that was not ultimately performed by these MBEs, WBEs, and DBEs.

43.     As stated above, JKCC certified in its contracts with Chicago that there would be approximately 24% MBE participation and 4% WBE participation in all of its contracts. JKCC, however, did not intend to, and did not, meet those requirements. Joel Kennedy also falsely certified for JKCC that there would be 23% DBE participation in the IDOT contract.

44.     The MBEs and WBEs that were to perform work under JKCC's contracts with Chicago had been certified as MBEs and/or WBEs under Chicago's Department of Procurement Services Certification and Compliance Division.

45.     MBEs must have at least 51% minority ownership or have 51% of their business controlled by one or more minority groups, while WBEs have at least 51% ownership by a woman or have 51% of their business controlled by one or more women.

46.     JKCC and the Subcontractor Defendants provided certifications in which they committed to the MBE/WBE participation totals in the City contracts. Contract Number 43252 contains the following representative certification:

> 22. Minority Business Enterprise Commitment and Women Business Enterprise Commitment
> The attention of bidders is directed to the Special Condition Regarding Minority Business Enterprise Commitment and Women Business Enterprise Commitment and

the Proposal Schedules that precede the Proposal form. If awarded the Contract, the bidder agrees to expend at least the percentage of the contract price indicated on bidder's Proposal Schedules for participation by bona fide Minority Business Enterprises and Women Business Enterprises. Appropriate Schedules must be completed and executed by the bidder in submitting a proposal. Refer to Book 1.

47.     This commitment to the MBE and WBE participation totals is certified with the statement:

I DO SOLEMNLY DECLARE AND AFFIRM UNDER PENALTIES OF PERJURY THAT THE CONTENTS OF THE FOREGOING DOCUMENT ARE TRUE AND CORRECT, AND THAT I AM AUTHORIZED ON BEHALF OF THE PRIME CONTRACTOR TO MAKE THIS AFFIDAVIT.

48.     The above attestation was signed by Joel Kennedy, President of JKCC and notarized by JKCC Project Engineer and MBE/WBE Liaison Officer Mike Patti on September 14, 2016. Moreover, the Defendants signed and completed a Schedule C: Letter of Intent to Perform as a Subcontractor to the Prime Contractor in this and other City contracts, in which they certified that they would participate in the contract at the agreed-upon rates specified in Schedule D of the contract.

49.     These certifications, however, were fraudulent. As discussed above and below, the Subcontractor Defendants were not performing the work and/or were not authorized to perform the work for which JKCC was improperly claiming credit.

50.     In the Chicago contracts at issue in this lawsuit, JKCC and the MBEs and WBEs claimed that $67,619,456 would be allocated to work performed by MBEs and WBEs.

51.     Thus, JKCC and the MBEs and WBEs promised that approximately $70 million would go to legitimate MBE and WBE work, advancing an important public policy and contractual goal of encouraging participation in government contracts by historically underrepresented groups.

14

52. Defendants thwarted the MBE/WBE requirements and ignored their promises, resulting in not only a major loss of business to the legitimate MBE and WBE community but also a significant blow to the ability of such companies to develop and thrive, which is the primary intent of all MBE and WBE programs.

53. As stated above, JKCC also certified in its contract with IDOT that there would be 23% DBE participation. JKCC, however, did not intend to, and did not, meet that requirement.

54. JKCC and the Subcontractor Defendants provided certifications in which they committed to the DBE participation totals in the IDOT contract. The IDOT contract contains the following certification attested to by Joel Kennedy and JKCC as well as the DBE subcontractor Defendants:

> The undersigned certify that the information herein is true and correct, and that the DBE firm listed below has agreed to perform a commercially useful function in the work of the contract item(s) listed above and to execute a contract with the prime contractor. The undersigned further understand that no changes to this statement may be made without prior approval from the Department's Bureau of Small Business Enterprises and that complete and accurate information regarding actual work performed on this project and the payment therfor must be provided to the Department.

55. These certifications, however, were fraudulent. As discussed above and below, the Subcontractor Defendants were not performing the work for which JKCC was improperly claiming credit.

56. In the IDOT contract at issue in this lawsuit, JKCC and the DBEs claimed that $2,182,481.84 would be allocated to DBEs.

57. Thus, with respect to the IDOT contract, JKCC and the DBEs promised that more than $2 million would go to legitimate DBE work, advancing an important public policy and

contractual goal of encouraging participation in government contracts by historically underrepresented groups.

58. Defendants ignored their promises and the DBE requirements, resulting in not only a major loss of business to the legitimate DBE community but also a significant blow to the ability of these companies to develop and thrive, which is the primary intent of all DBE programs.

59. Defendants carried out the MBE/WBE/DBE fraud in various ways.

60. For example, the contracts permitted JKCC to claim MBE/WBE/DBE credit for materials that MBE/WBE/DBE companies purchased for their work on the contracts. JKCC, however, often really purchased that material and performed the work itself, while allowing the material to pass through the subcontractor and then falsely claiming MBE/WBE/DBE credit.

61. To compensate the pass-through entities for their involvement in the scam, JKCC would pay the pass-throughs a three percent markup of charges the pass-throughs incurred, such as paying Martinez Underground a three percent markup for concrete purchases for JKCC Project Number 1141 while claiming credit for Martinez Underground performing concrete-related work that it did not in fact perform.

62. For example, Martinez Underground and Barrera Construction were involved in schemes to give the false impression that they were performing the amount of MBE/WBE/DBE work required under the contracts.

63. Specifically, to make it appear as if they were performing work on the contracts, Martinez Underground and Barrera Construction would pay for materials, such as concrete, that were necessary for the work to be performed on the contracts. Instead of Martinez Underground or Barrera Construction actually using the purchased materials to perform the amount of work they had contracted to perform, however, JKCC would perform the work itself using the purchased

16

materials but still claim MBE/DBE/WBE credit as if Martinez Underground and Barrera Construction were performing the work.

64.     In exchange for allowing JKCC to falsely claim MBE/DBE/WBE credit, JKCC would reimburse Martinez Underground and Barrera Construction for the purchased materials, plus a 3% bonus or mark-up on top of the reimbursement.

65.     By operating this way, JKCC could evade the MBE/WBE/DBE work requirements by claiming that the MBEs, WBEs, and DBEs performed a substantial amount of work that they did not in fact perform.

66.     Normally, if a subcontractor actually were performing the work on a contract, that subcontractor would negotiate with and directly order from the suppliers. However, under this scheme, JKCC would often negotiate with suppliers and place orders for materials for work that was supposed to be done by MBEs, WBEs, and DBEs but was actually done by JKCC, including with respect to purchases purportedly made by Martinez Underground and Barrera Construction.

67.     That JKCC negotiated and purchased the material and performed the work itself shows that Martinez Underground and Barrera were both knowledgeable about the fraudulent scheme, in addition to JKCC's knowledge of the scheme.

68.     JLA & Sons also functioned as a pass-through for materials purchased, to mask the fact that JKCC was doing work which should have been performed by MBEs per the contractual requirements and certifications.

69.     JLA & Sons actually spent approximately $1,100,000 on labor and materials on this contract, which is the maximum amount of MBE credit that could have potentially been claimed, but JKCC actually claimed MBE credit of nearly $1,600,000 for JLA & Sons' purported work on the contract. In doing so, JKCC claimed credit for hundreds of thousands of dollars in

17

materials that it attributed to JLA & Sons' work but that was actually merely passed through to JKCC.

70.     JLA & Sons was aware of the fraudulent charges no later than January 2014 but failed to stop the fraud or take any steps to correct the fraudulent claims for MBE credit.

71.     JKCC also used its own employees to perform certain work and then fraudulently claimed that they worked for the MBEs, WBEs, and DBEs so that JKCC could claim credit for MBE/WBE/DBE work without actually giving that work to MBEs/WBEs/DBEs. JKCC carried out this scheme by supplying paperwork that falsely stated JKCC employees were actually employed by the subcontractors. For instance, a certified payroll from June 2012, used in conjunction with the IDOT project, claimed that Martinez Underground was employing multiple individuals who actually worked for JKCC.

72.     Additionally, an in-house ledger prepared by Robin Jasper in or around October 2012 for the IDOT project shows that there are only three legitimate Martinez Underground employees, while the rest were JKCC employees improperly put on Martinez Underground's payroll.

73.     Former JKCC superintendent Bernie Prisby, who was in charge of the IDOT project, maintained a daily diary in which he kept track of which payroll certain JKCC employees should be placed on by writing "J" for "JKCC" or "M" for "Martinez Underground" next to an employee's name to indicate the payroll on which that employee should be included.

74.     Because the personnel assignments changed on a daily basis, Mr. Prisby eventually stopped attempting to keep track of these assignments and would simply communicate the workers' time to Robin Jasper via telephone.

18

75.     Ms. Jasper would then segregate the Martinez Underground payroll and fax it over to the Martinez Underground office so that Martinez Underground could write checks for the proper amounts while also maintaining records of certified payroll to submit to IDOT to perpetrate the fraud.

76.     Ms. Jasper engaged in the equivalent procedure with Barrera Construction by emailing timesheets to Miriam Baker, daughter of President Jose L. Barrera, as Ms. Baker runs the day-to-day business for Barrera Construction.

**Unauthorized Work Performed By Trucking Companies**

77.     For the City contracts at issue, the MBEs and WBEs were only certified to perform certain work.

78.     Defendants ignored those limitations and performed (and sought credit from the government for) work they were not authorized to perform.

79.     By way of example, trucking company Defendants E. King, Orient Express, Midwest REM, Chicagoland Truckin, and Menini Cartage were certified to perform limited tasks, and they were not authorized suppliers or distributors.

80.     Only authorized suppliers and distributors may charge the government for providing materials for a contract, including charges for bringing the materials to the job sites. JKCC used the above-listed MBEs and WBEs to pass-through the charges for providing materials and bringing those materials to the dump site and attributed that work to those entities despite the fact that they were not authorized to perform that work. Attributing the work to those MBEs and WBEs falsely expanded the percentage of the contract for which JKCC could claim credit for MBE and WBE subcontractor labor and increased the price of the overall contracts on which the MBE and WBE credits were claimed.

81.     Trucking company Defendants E. King, Orient Express, Midwest REM, Chicagoland Truckin, and Menini Cartage were aware that they were not certified suppliers or distributors (other than Orient Express before March 2013), and, thus, JKCC could not bill materials or dumping fees through them. These defendants knowingly went along with JKCC's scheme by allowing JKCC to bill unauthorized fees and materials through them as a means for JKCC to claim MBE/WBE credit for unauthorized services.

82.     Without billing these unauthorized services through the Defendants, JKCC never would have achieved the percentages of MBE/WBE work they had agreed to in the contracts.

83.     In addition, the contracts permitted JKCC to claim credit for certain work provided by MBEs/WBEs that were certified as trucking companies. In particular, JKCC could get MBE/WBE credit for 60% of the value of the material that certified suppliers provided and 100% if the certified supplier was also a certified trucking company that used its own trucks.

84.     JKCC, however, ignored those rules and claimed credit for 100% of the value of the material that subcontractors purportedly provided even when the relevant subcontractors were not properly certified and no credit should have been claimed for that material.

85.     JKCC utilized this scheme with, at a minimum, Defendants E. King, Orient Express, Midwest REM, Chicagoland Truckin, and Menini Cartage on each of the City contracts at issue in this case.

86.     As with the other MBE/WBE/DBE schemes, JKCC would reward these trucking companies for their participation in the scheme by reimbursing them for the materials as well as paying them a 3% mark-up on the material that JKCC attributed to the suppliers.

87.     If the subcontractors had actually been certified as suppliers or distributors, they would have received letters of certification indicating these certifications. Lacking those

certificates, the trucking subcontractors were well-aware that they were not certified as suppliers or distributors and that MBE/WBE credit should not have been claimed for the materials that the purportedly supplied.

### Backfill Material Fraud

88.    Backfilling entails placing imported material (trench backfill) back into an excavated area in which construction work has been completed.

89.    JKCC performed backfilling on the contracts at issue.

90.    The contracts for the water main projects required the use of a washed CA-16 backfill material, which has a higher price than other backfill material.

91.    To avoid these costs, JKCC knowingly used an unwashed CA-16 material but attempted to pass it off as a washed material in blatant disregard for the contractual requirements.

92.    Joel Kennedy told Relator that Kennedy knew that the backfill material used by JKCC was unwashed.

### Lack of Knowledge of Government Officials

93.    No official of the United States Government, State of Illinois, Illinois Department of Transportation, or City of Chicago charged with responsibility to act on the frauds alleged herein knew or reasonably should have known of the frauds or the related false statements prior to the filing of this complaint.

### Count I – False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)

94.    Relator incorporates each paragraph of this Complaint as if fully set forth herein.

95.    As described above, Defendants knowingly presented, or caused to be presented a false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

96.    As described above, Defendants knowingly made, used, or caused to be made or

21

used, false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B).

97.     As a result of these claims, the United States Government suffered damages to be determined at trial.

### Count II – False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

98.     Relator incorporates each paragraph of this Complaint as if fully set forth herein.

99.     Defendants conspired to defraud the United States Government by getting false or fraudulent claims allowed or paid, and/or conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) or (B), in violation of 31 U.S.C. § 3729(a)(1)(C).

100.    As a result of their acts or omissions, Defendants caused the United States to sustain damages in an amount to be determined at trial.

### Count III – False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

101.    Relator incorporates each paragraph of this Complaint as if fully set forth herein.

102.    Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

103.    As a result of their acts or omissions, Defendants caused the United States to sustain damages in an amount to be determined at trial.

### Count IV – Illinois False Claims Act, 740 ILCS 175/3(a)(1)(A) and (a)(1)(B)

104.    Relator incorporates each paragraph of this Complaint as if fully set forth herein.

105.    As described above, Defendants knowingly presented, or caused to be presented, to an official or employee of the State of Illinois, false or fraudulent claims for payment or approval, in violation of 740 ILCS 175/3(a)(1)(A).

106.    As described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the State of Illinois, in violation of 740 ILCS 175/3(a)(1)(B).

107.    As a result of these claims, the State of Illinois paid Defendants and suffered damages to be determined at trial.

### Count V – Illinois False Claims Act, 740 ILCS 175/3(a)(1)(C)

108.    Relator incorporates each paragraph of this Complaint as if fully set forth herein.

109.    Defendants conspired to defraud the State of Illinois by getting false or fraudulent claims allowed or paid, and/or conspired to commit a violation of 740 ILCS 175/3(a)(1)(A) or (B), in violation of 740 ILCS 175/3(a)(1)(C).

110.    As a result of their acts or omissions, Defendants caused the State of Illinois to sustain damages in an amount to be determined at trial.

### Count VI – Illinois False Claims Act, 740 ILCS 175/3(a)(1)(G)

111.    Relator incorporates each paragraph of this Complaint as if fully set forth herein.

112.    Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Illinois, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Illinois, in violation of 740 ILCS 175/3(a)(1)(G).

113.    As a result of their acts or omissions, Defendants caused the State of Illinois to sustain damages in an amount to be determined at trial.

## Count VII – Chicago False Claims Act, Municipal Code of Chicago Chapter 1-22-020(1) and 1-22-020(2)

114.    Relator incorporates each paragraph of this Complaint as if fully set forth herein.

115.    As described above, Defendants knowingly presented, or caused to be presented, to an official or employee of the City of Chicago, false or fraudulent claims for payment or approval, in violation of Municipal Code of Chicago Chapter 1-22-020(1).

116.    As described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the City of Chicago, in violation of Municipal Code of Chicago Chapter 1-22-020(2).

117.    As a result of these claims, the City of Chicago paid Defendants and suffered damages to be determined at trial.

## Count VIII – Chicago False Claims Act, Municipal Code of Chicago Chapter 1-22-020(3)

118.    Relator incorporates each paragraph of this Complaint as if fully set forth herein.

119.    Defendants conspired to defraud the City of Chicago by getting false or fraudulent claims allowed or paid, and/or conspired to commit a violation of Municipal Code of Chicago Chapter 1-22-020(1) or 1-22-020(2), in violation of Municipal Code of Chicago Chapter 1-22-020(3).

120.    As a result of their acts or omissions, Defendants caused the City of Chicago to sustain damages in an amount to be determined at trial.

## Count IX – Chicago False Claims Act, Municipal Code of Chicago Chapter 1-22-020(7)

121.    Relator incorporates each paragraph of this Complaint as if fully set forth herein.

24

122. Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the City of Chicago, in violation of Municipal Code of Chicago Chapter 1-22-020(7).

123. As a result of their acts or omissions, Defendants caused the City of Chicago to sustain damages in an amount to be determined at trial.

### Jury Trial Demanded

The United States of America, the State of Illinois, the State of Illinois Department of Transportation, and the City of Chicago, on the relation of Angelo Milazzo, hereby demand trial by jury on all issues so triable.

WHEREFORE, Relator Angelo Milazzo respectfully requests that the Court enter judgment in his favor and in favor of the United States of America, the State of Illinois, the State of Illinois Department of Transportation, and the City of Chicago against Defendants, awarding treble damages, penalties, and all appropriate relief for violations of the federal False Claims Act, the Illinois False Claims Act, and the Chicago False Claims Act, and awarding Relator Angelo Milazzo thirty percent of the government's recovery as well as costs and attorney fees.

Respectfully submitted,

/s/ Frank Newell
Frank Newell

Mike Kanovitz
Scott Rauscher
Frank Newell
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
Ph: (312) 243-5900

Frank@loevy.com
Mike@loevy.com
Scott@loevy.com

*Attorneys for Relator*

## CERTIFICATE OF
## SERVICE

I, Frank Newell, an attorney, hereby certify that on this 27th of November, 2019, I electronically filed the forgoing **Amended Complaint** with the Clerk of the Court using the CM/ECF system, which thereby electronically served all counsel of record.

Dated: November 27, 2019

Respectfully submitted,

BY: /s/ Frank Newell___

Mike Kanovitz
Scott Rauscher
Frank Newell
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
Fax: 312-243-5902

Frank@loevy.com / (312) 243-5900
Mike@loevy.com / (312) 243-5900
Scott@loevy.com / (312) 243-5900

*Attorneys for Relator*