**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,      )
STATE OF ILLINOIS, and CITY OF      )
CHICAGO *ex rel.* ANGELO      )
MILAZZO,      )
     )      No. 17 C 03062
     Plaintiff-Relator,      )
     )      Judge John J. Tharp, Jr.
     v.      )
     )
JOEL KENNEDY CONSTRUCTING      )
CORP., and JOEL W. KENNEDY,      )
     )
     Defendants.      )

## <u>MEMORANDUM OPINION AND ORDER</u>

Relator Angelo Milazzo and the City of Chicago collectively allege that Joel Kennedy Constructing Corp. and its owner and president, Joel Kennedy, misrepresented the corporation's status as a city-based business and obfuscated JKCC's non-compliance with worker residency provisions in hundreds of millions of dollars' worth of public works contracts performed for the City over the course of at least a decade. Milazzo's second amended complaint asserts federal, state, and municipal causes of action against JKCC for the submission of false claims. Milazzo Second Am. Compl, ECF No. 68. The City-Intervenor's complaint alleges claims under the municipal false claims, false statements, and consumer fraud ordinances against JKCC and Kennedy, as an individual, and for breach of contract against JKCC. City Compl., ECF No. 45. The defendants have moved to dismiss both complaints under Rule 12(b)(6) for failure to state a claim. Defs.' Mot. Dismiss, ECF No. 59. That motion is granted in part and denied in part. Milazzo's second amended complaint and Counts I and II of the City's complaint are dismissed without prejudice; the plaintiffs have inadequately pleaded that the defendants presented false or fraudulent claims to the City and that the defendants' alleged misrepresentations regarding their

compliance with the relevant ordinances were material, and the City has inadequately pleaded Kennedy's individual involvement in the CRO scheme. The City's other claims survive.

## I.     BACKGROUND

For purposes of evaluating the motion to dismiss, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the plaintiffs. Joel Kennedy Constructing Corporation is an Illinois corporation with its principal place of business in Waukegan, Illinois. City Compl. ¶¶ 7, 80; ECF No. 45. The company has a long history of doing construction work with the city of Chicago. *Id.* at ¶¶ 12-13. Joel Kennedy is the president and owner of JKCC; he has been president of JKCC since at least 1982. *Id.* at ¶ 8. Relator Angelo Milazzo was a JKCC employee from approximately 1987 to 2015, and a ten percent owner of JKCC until 2011. Milazzo Second Am. Compl. ¶ 5, ECF No. 68. He held a variety of senior positions at JKCC, including corporate secretary/treasurer, project manager, engineer, and head estimator. City Compl. at ¶ 9.

Milazzo filed this qui tam action in 2017. The City of Chicago intervened in November 2019. Together, Milazzo and the City allege that JKCC engaged in fraud relating to six contracts with the City of Chicago:

- JKCC Project/Job No. 1141, Contract (PO) Number 19367, Specification Number 68904: contract between JKCC and the City of Chicago Department of Water Management entitled "Private Drain Repair – North Area/DWM Project 6220A," which was awarded on or around March 3, 2009, and was set to end on or around March 3, 2011, but was extended for at least another year. (Dkt. No. 45-1). The final contract value was more than $8,000,000.

- JKCC Project/Job No. 1154, Contract (PO) Number 26407, Specification Number 104069: contract between JKCC and the City of Chicago Department of Water Management entitled "North District Water Construction," which was awarded on or around May 10, 2012, and ended on or around February 3, 2013. (Dkt. No. 45-2). The final contract value was more than $26,400,000.

- JKCC Project/Job No. 1157, Contract (PO) Number 27739, Specification Number 112101: contract between JKCC and the City of Chicago Department of Water Management entitled "Water Main Construction – District One," which was awarded

on or around January 31, 2013, and was set to end on or around January 27, 2016, but was extended through at least the end of 2016. (Dkt. No. 45-4). The final contract value was more than $77,000,000.

- JKCC Project/Job No. 1158, Contract (PO) Number 27738, Specification Number 112102: contract between JKCC and the City of Chicago Department of Water Management entitled "Water Main Construction – District Two," which was awarded on or around January 30, 2013, and was set to end on or around January 27, 2016, but was extended through at least the end of 2016. (Dkt. No. 45-3). The final contract value was more than $79,600,000.

- JKCC Project/Job No. 1159, Contract (PO) Number 28325, Specification Number 115457: contract between JKCC and the City of Chicago Department of Water Management entitled "Damen Avenue Sewer Improvement – N. Damen Ave & W. Albion Ave.," which was awarded on or around July 24, 2013 and ended on or around July 27, 2017. (Dkt. No. 45-5). The final contract value was more than $4,000,000.

- Contract (PO) Number 43252, Specification Number 127995: contract between JKCC and the City of Chicago Department of Water Management entitled "Augusta Boulevard Sewer Improvement," which was awarded on or around October 19, 2016, and ended on or around February 13, 2018. (Dkt. No. 45-6). This contract was federally funded with money allocated by the United States Department of Housing and Urban Development. The final contract value was more than $1,900,000.

There are now two operative complaints: The City-Intervenor's complaint (Dkt. 45) and Milazzo's second amended complaint ("SAC"; Dkt. 68). In the SAC, Milazzo brings federal (Counts I and II), state (Counts III and IV), and city (Counts V and VI) false claims act claims predicated on JKCC's fraudulent noncompliance with the Chicago Residency Ordinance ("CRO"), as incorporated into each of JKCC's contracts with the City. The City's complaint raises claims based on the municipal false claims ordinance (Count I); the municipal false statements ordinance (Count II); the municipal consumer fraud ordinance (Count III); and breach of contract (Count IV), predicated on JKCC's fraudulent noncompliance with the CRO and, in addition, allegedly false attestations that it qualified for the Chicago Business Preference. The City alleges Counts I, II, and III against both JKCC and Joel Kennedy, in his individual capacity, and Count IV against JKCC only.

The plaintiffs' complaints describe two fraudulent schemes JKCC allegedly engaged in to avoid its obligations under City contracts. Those schemes are examined in turn.

### A.      The Chicago Residency Requirement (Milazzo and City)

Each of JKCC's contracts with the City required that at least fifty percent of the total number of labor hours worked under the contract be performed by Chicago residents. Milazzo SAC ¶ 10. Milazzo alleges that JKCC did not comply with those residency requirements, despite its certifications to the contrary. Per the City contracts, JKCC was required to provide certified payroll documentation on a weekly basis. *Id.* at ¶ 14. The submitted payrolls, each of which JKCC was required to certify was "correct and complete," included each worker's address information, so that the City could verify that JKCC was complying with the residency requirements. *Id.*; *see also* City Compl. Ex. A at 33, ECF No. 45-1 ("Certified payroll reports (U.S. Department of Labor Form WH-347 or equivalent) must be submitted weekly to the Commissioner of the supervising department in triplicate, shall identify clearly the actual residence of every employee on each submitted certified payroll."). Compliance with the residency requirement was not optional—the contract books expressly state that "[g]ood faith efforts on the part of the contractor to provide utilization of actual Chicago residents shall not suffice to replace the actual, verified achievement of the requirements of this section concerning the worker hours performed by actual Chicago residents." *Id.* The contract papers were similarly clear that non-compliance with the residency requirement would result in a financial penalty—contractors were informed that "[w]hen work is completed, in the event that the City has determined that the contractor failed to ensure the fulfillment of the requirement of this section . . . the City will thereby be damaged in the failure to provide the benefit of demonstrable employment to Chicagoans to the degree stipulated" and "1/20 of 1 percent (.05%) of the approved contract value for this contract shall be surrendered by the contractor to the City in payment for each percentage of shortfall toward the stipulated residency

requirement." *Id.* If a contractor failed to report employees' residency "entirely and correctly," the contractor would "surrender the entire liquidated damages as if no Chicago residents were employed" in fulfilling the contract. *Id.* Contractors were warned that they were required to keep personnel data for at least three years; that affidavits or other supporting documentation may be asked for to verify the submitted data; and that the willful falsification of statements and certification of payroll date may expose the contractor to criminal prosecution. *Id.*

Milazzo alleges that the residency fraud was carried out in two ways. First, JKCC "routinely" omitted non-City employees from the payroll documentation to artificially inflate the City-resident to non-City resident employee ratio. Milazzo Second Am. Compl. at ¶ 19. Milazzo contends JKCC kept two different sets of payroll records: one used internally, and one that was submitted to the city. *Id.* at ¶ 20. Robin Jasper, a JKCC employee and Board Member, "would typically gather the payroll each week and tender it to the company's payroll provider"; a different employee, Leonor Bond, would draft the certified payroll documentation to be submitted to the city. *Id.* at ¶ 21. JKCC project engineer Michael Patti, who was responsible for keeping track of the residency requirement, would instruct Bond to omit certain employees before reporting the information to the city. *Id.* Milazzo provides examples, such as the week ending on July 5, 2015. *Id.* at ¶ 22. In that week, JKCC paid 27 people for work performed on city contracts (according to official payrolls submitted to the JKCC's payroll company) but reported paying only 15 of those people to the City in an effort to inflate the percentage of work done by City residents. *Id.*

Second, JKCC sometimes used fake Chicago addresses for employees who did not actually reside in Chicago. *Id.* at ¶ 19. Milazzo names several employees whose addresses JKCC had, at some point, falsified, including Joel Kennedy's sisters, Sherry and Kristie, Joe and Hugo Lozano, Avery Jackson, and Jorge Ayala. *Id.* at ¶ 26. Milazzo contends that Joel Kennedy knew each of

these people personally and therefore knew that they did not live in Chicago, though the certified payrolls reported otherwise. In December 2014, JKCC falsely reported two employees as residing at the Chicago home of JKCC Board Member, VP, and General Counsel Paul Lubanski. *Id.* Finally, JKCC's certified payroll documents were sometimes inconsistent for the same person across projects. Sherry Kennedy, for example, was reported at her true Harvard, Illinois address in October 2012, but at a Chicago residence for later projects; at other times, the inconsistencies are revealed by comparing JKCC's legitimate direct deposit information with the address information provided on the certified payrolls.

### B.     Chicago Business Preference (City)

Chicago's municipal code Section 2-92-412 requires that, for applicable contracts with estimated contract values of $100,000 or more, the City's Chief Procurement Officer shall allocate a bid preference to any qualified bidder that is a prime contractor that is a City-based business. City Compl. at ¶¶ 67-68. A "city-based business" is one that "(i) conducts meaningful day-to-day business operations at a facility located within the city and that facility is the place of employment for the majority of its . . . regular, full-time workforce; (ii) holds all appropriate city licenses; and (iii) is subject to applicable city taxes." *Id.* at ¶ 68. Each of the city contracts except for P.O. 43252 allowed prospective bidders to apply for the Chicago Business Preference. *Id.* at ¶ 69; *see, e.g.*, City Compl. Ex. A at 101 ("A Chicago business . . . is a business located within the corporate limits of the City, which has the majority of its regular, full-time work force located within the City, and is subject to City of Chicago taxes."). The preference operated such that the Chief Procurement Officer "will accept the lowest bid price or lowest evaluated bid price from a responsive and responsible Chicago business, provided that the bid does not exceed the lowest bid price or lowest evaluated bid price from a responsive and responsible non-Chicago business by more than two percent (2%)." *Id.*

JKCC submitted an "Affidavit of Chicago Business" in connection with each of the eligible contracts. *See* City Compl. Ex. G. On each affidavit, Joel Kennedy attested that the JKCC is a "Chicago Business" as defined by Book I of each contract; listed a Chicago street address as JKCC's principal place of business; indicated JKCC's total number of employees and number of current employees working at City of Chicago locations; and responded affirmatively that JKCC is subject to city taxes. *Id.* The City alleges, however, that JKCC is ***not*** a business located within the city's corporate limits, because its principal place of business is in Waukegan, and that, at relevant times, JKCC did not maintain most of its regular workforce within the city. City Compl. at ¶¶ 71-81. The City alleges that JKCC and Kennedy made these false statements to gain an advantage in the City procurement process. *Id.* at ¶ 82.

## II.    DISCUSSION

The defendants have moved to dismiss the plaintiffs' complaints under Rule 12(b)(6). Defs.' Mot. Dismiss, ECF No. 59. In reviewing the sufficiency of a complaint, this Court must accept all well-plead facts as true and draw all permissible inferences in favor of the plaintiffs. *United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 912 (N.D. Ill. 2015) (citing *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012)). The Federal Rules of Civil Procedure's notice-based pleading standard requires a complaint to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Fraud-based claims brought under the False Claims Act, however, are subject to the heightened pleading standard of Rule 9(b), which requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The "precise level of particularity required under Rule 9(b) depends upon the facts of the case," but the pleading generally should describe "the who, what, when, where, and how of the fraud." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014); *see also United*

*States ex rel. Prose v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 739 (7th Cir. 2021) (under the federal and state false claims acts, a plaintiff's allegations must be "precise" and "substantiated," though "courts and litigants should not 'take an overly rigid view of the formulation'") (citations and some internal quotations omitted).

### A. Jurisdiction

The defendants do not challenge this Court's jurisdiction, but courts have "an independent obligation to determine whether subject-matter jurisdiction exists," *Arbaugh v. Y&H Corp.*, 564 U.S. 500, 501 (2006), and the question of federal jurisdiction warrants consideration where the United States is not a party to any of the six contracts at issue.. Milazzo invokes federal-question jurisdiction under 28 U.S.C. § 1331 by asserting a violation of the federal False Claim Act, 31 U.S.C. § 3729, and supplemental jurisdiction under 28 U.S.C. § 1367 for claims premised on violations of the state and municipal false claims acts. Contending that its claims arise out of the same case or controversy—the same allegedly fraudulent conduct—as Milazzo's federal and supplemental state and local claims., the City of Chicago has alleged supplemental jurisdiction over its municipal claims as well.

To begin, there is no infirmity in the invocation of federal question jurisdiction. A private person may bring a civil action under the federal False Claims Act, on behalf of the federal government, for a violation of 31 U.S.C. § 3729, which prohibits (among other conduct) the knowing presentation of a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1). The statute defines a claim to include requests or demands for money made to a "contractor, grantee, or other recipient" of government money, "if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest" and the United States Government "provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b)(2)(A). Milazzo has alleged Contract (PO) Number

43252 between JKCC and the City of Chicago Department of Water Management, entitled "Augusta Boulevard Sewer Improvement," is "federally funded with money allocated by the United States Department of Housing and Urban Development." Milazzo Am. Compl. at ¶ 9(e). As such, JKCC's allegedly fraudulent claims for money under that contract create a federal false claims cause of action, though those claims were directed to the City—a "grantee, or other recipient" per § 3729(b)(2)(A)(ii)—and not to HUD, directly.

The majority of the plaintiffs' claims, however, are state and municipal claims arising out of municipally funded contracts. This Court's exercise of supplemental jurisdiction over those claims is nonetheless appropriate under 31 U.S.C. § 3732(b), which provides for district court jurisdiction over state law claims regarding state funded contracts "if the action arises from the same transaction or occurrence as an action brought under section 3730." The Seventh Circuit has previously observed that there is "no formalistic test" for determining whether claims arise out of the "same transaction or occurrence," but that factors such as "the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds" should be considered. *Ross ex rel. Ross v. Bd. of Educ. of Tp. High School Dist. 211*, 486 F.3d 279, 284 (7th Cir. 2007). Those factors weigh in favor of jurisdiction here—the plaintiffs' state and local law claims involve the same or substantively similar false claims JKCC allegedly made to receive payment on its public works contracts; those claims were allegedly part of a broader scheme spanning several contracts and years; and, as discussed below, the state and local statutes are interpreted by reference to the federal false claims statute. And at least one district court has concluded that "an alleged system or scheme of making false claims to both federal and state entities can be considered 'the same transaction or occurrence' for jurisdiction purposes" under Section 3732(b). *United States ex rel. Anthony v. Burke Engineering Co.*, 356 F. Supp. 2d 1119, 1120 (C.D. Cal. 2005).

This Court agrees and concludes that it has jurisdiction over the state and municipal causes of action pursuant to section 3732(b).

**B.      Relator and the City Have Failed to Adequately Allege that the Defendants Submitted False Claims**

The plaintiffs' false claims allegations are somewhat complex; the relevant counts of their respective complaints comprise two schemes, three statutes, several subsections of each statute, and various legal theories. Parsing out these components, Milazzo essentially raises three claims that each assert violations of three statutes: he invokes the presentment, false statement, and "reverse claim" subsections of each of the federal, state, and municipal false claims statutes, based on JKCC's alleged fraud obscuring its noncompliance with the CRO. The City also presses presentment, false statement, and "reverse claim" theories based on the alleged CRO scheme, but only under the municipal false claims ordinance. The City also adds a claim under the municipal false statements ordinance predicated on the allegedly false attestations used to qualify for the Chicago Business Preference. The Illinois False Claims Act and City's municipal false claims and false statements ordinances are interpreted by reference to the federal False Claims Act case law. *See, e.g.*, *People ex rel. Lindblom v. Sears Brands, LLC*, 143 N.E.3d 101, 112 (Ill. App. Ct. 2019) ("Because the [Illinois False Claims] Act closely mirrors the federal False Claims Act . . . we may look to federal law for guidance in construing the Act."); *City of Chicago ex rel. Rosenberg v. Redflex Traffic Sys., Inc.*, 884 F.3d 798, 802-03 (7th Cir. 2018) ("Given the substantive similarity between the Illinois False Claims Act (IFCA) . . . and the FCA, Illinois courts have relied upon federal cases interpreting the FCA in construing the provisions of the IFCA. . . . We are confident Illinois courts would likewise look to federal FCA cases in interpreting the [municipal] FCO."); *City of Chicago v. Smollett*, 421 F. Supp. 3d 565, 571-72 (N.D. Ill. 2019) ("[B]ecause Illinois courts would likely use state and federal False Claims Act cases when interpreting the City's False

Claims Ordinance . . . the Court will also look to state and Federal False Claims Act cases to aid its interpretation of the City's False Statements Ordinance, given the similarity between the two ordinances."). Neither party argues that there are substantive differences between the federal, state, and municipal false claims statutes that warrant analyzing the claims separately in this case, so the Court's analysis will not distinguish between them. The plaintiffs' false claims theories are examined in turn.

1.  Presentment of False or Fraudulent Claims

The plaintiffs' first false claim theory is that the defendants knowingly presented, or caused to be presented, a false or fraudulent claim. Based on JKCC's alleged violations of the CRO, the plaintiffs argue that: (1) the certified payrolls themselves are false claims that were presented to the City; and (2) even if the payrolls themselves are not "claims" within the meaning of the statutes, that the alleged fraud on the certified payrolls rendered the defendants' explicit or implicit representations of compliance with relevant contractual or regulatory provisions—communicated through their submission of invoices for payment—false and fraudulent. The plaintiffs also base their presentment claims on a fraudulent inducement theory. Milazzo and the City both argue that the defendants never intended to comply with the CRO and that, if the City had known as much, it would never have awarded the relevant contracts to JKCC—and, as such, all claims for payment under the contract were false or fraudulent. The City additionally argues that the defendants' misrepresentations regarding JKCC's status as a City-based business induced the City to enter into the relevant contracts with JKCC and rendered all claims for payment under the contracts false or fraudulent.

a)  *The Certified Payrolls Are Not Claims*

The defendants first argue that the certified weekly payrolls are not themselves "claims." Under all three false claims authorities, a claim is defined to include "any request or demand,

whether under a contract or otherwise, for money or property" that is presented to an officer, employee, or agent of the relevant government unit. 31 U.S.C. § 3729(b)(2)(A); 740 ILCS § 175/3(b)(2)(A); MCC § 1-22-010. The plaintiffs urge that the term "claim" should be "construed broadly" to reach "all fraudulent attempts to cause the [g]overnment to pay out sums of money," and note that JKCC's submission of weekly payroll reports was a condition of payment. Pls.' Resp. Opp'n at 27-28 (alteration in original).

The Court agrees with the defendants that the weekly payroll certifications are not themselves "claims" within the relevant statutory definitions. The weekly payrolls simply did not assert any request or demand for payment. Milazzo and the City cite language from other courts in this district to argue that the certified payrolls are "claims," even though they are not invoices and even though they "did not result in immediate payment from the government," because the "statute reaches beyond claims which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, No. 02 C 6074, 2006 WL 4586279, at *5 (N.D. Ill. Sept. 13, 2006). In *Tyson*, however, the allegedly false enrollment forms that the plaintiff identified as false or fraudulent "claims" were "submitted in order to receive payment for the individuals who were ultimately enrolled"— submission of the enrollment forms at issue triggered the Illinois Department of Healthcare and Family Service's payment of an "applicable capitation rate for each enrollee" and subsequent "monthly capitation payments to Amerigroup Illinois based on its enrollees." *Id.* at *1, *5.

By contrast, the plaintiffs here do not allege that the weekly payroll submissions, standing alone, stood as "request[s] or demand[s]" for payment at all. Instead, the plaintiffs allege that the defendants' allegedly false certifications of their payroll submissions were necessary "in order to continue receiving payment on invoices submitted to the City"—recognizing, implicitly, that the

process for requesting payment was separate from the process for submitting payrolls. *See, e.g.*, Milazzo SAC at ¶ 14; City Compl. at ¶ 66; *see also* City Compl. at ¶ 45 ("Defendants submitted hundreds of invoices to the City under each of the DWM Contracts, including but not limited to invoices for labor, equipment, and materials for underground water main installation and sewer pipe installation."). Unlike the allegedly false applications in *Tyson*, the payroll certifications did not trigger payment for JKCC's work on the relevant contracts; instead, the certifications "allow[ed] the City to ensure that contractors such as JKCC were following the City's residency requirements." Milazzo Second Am. Compl. at ¶ 14. Payment was separately requested through invoices that were submitted according to an agreed payment schedule, but "at least once per month." *See, e.g.*, City Compl. Ex. A. at 47.

The nature of the defendants' alleged violations confirms that each payroll submission cannot constitute a "false claim," even if payrolls were otherwise claims within the meaning of the statute. Under each of the plaintiffs' theories of liability, the falsity of JKCC's requests for payment is based on their representation of compliance with—but actual noncompliance with—the CRO requirement, not on the fact that JKCC provided false addresses or omitted non-City resident workers from its payrolls. And each contract required only that at least fifty percent of the total number of hours worked be performed by City residents, not that at least fifty percent of the work performed each week be performed by City residents. *See, e.g.*, *id.* at 32 ("If the funding under this contract is $100,000 or more, Contractor . . . shall comply with the minimum percentage of total worker hours performed by actual residents of the City of Chicago as specified in § 2-92-330 of the Municipal Code . . . ."); MCC § 2-92-330 (for such contracts, "the total hours worked by persons on the site of the construction project by employees of the contractor and subcontractors shall be performed (i) at least 50 percent by city residents"). So, setting the allegations about fake

addresses and omitted workers aside, JKCC's claims for payment only became "false" at the point at which it was no longer possible for JKCC to comply with the 50% requirement; a single claim for payment early in the contract would not be inherently false based on the mere fact that less than fifty percent of the work performed in that period was performed by non-residents.

### b) Express or Implied Certification of Contractual Compliance

Because the weekly payroll submissions are not themselves "claims" under the federal, state, or municipal false claims act statutes and ordinance, the plaintiffs must plausibly plead that JKCC falsely certified, expressly or impliedly, its compliance with the CRO and thereby rendered its invoices for payment "false or fraudulent." "Under an express false certification theory, a plaintiff must allege that defendants 'falsely and specifically certified that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds.'" *United States v. Walgreen Co.*, 417 F. Supp. 3d 1068, 1085 (N.D. Ill. 2019) (citation omitted). And it is by now well-established that "'false or fraudulent claims' include more than claims containing express falsehoods"—"misrepresentations by omission can [also] give rise to liability." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 187 (2016) (*Escobar*). As such, a defendant may be liable under the False Claims Act under an implied certification theory "at least where two conditions are satisfied": first, that the defendant submitted a claim that went beyond "merely request[ing] payment" to "make[] specific representations about the goods or services provided," and second, that the defendant's "failure to disclose noncompliance with mandatory statutory regulatory or contractual requirements makes those misrepresentations misleading half-truths." *Id.* at 190; *see also Walgreen Co.*, 417 F. Supp. 3d at 1087 (explaining that an implied false certification theory applies when a defendant makes representations in submitting a claim but omits mention of its statutory, regulatory, or contractual violations, such that the defendant's incomplete representations are misleading with respect to the

14

goods or services provided); *United States v. Catholic Health Initiatives*, 312 F. Supp. 3d 584, 603 (S.D. Tex. 2018) (describing the requirements for the express and implied forms of a "legal falsity theory," wherein plaintiffs allege "that Defendants falsely certified compliance with a federal statute, regulation, or contract that is a prerequisite to obtaining the government benefit").

Milazzo and the City do not plausibly allege that the defendants expressly falsely certified their compliance with the CRO on invoices for payment under any of the relevant contracts. After summarizing the defendants' alleged practices of omitting non-City workers from certified payroll reports, providing false City addresses for non-City workers, and attributing contract work hours to workers assigned to different JKCC jobs, the City merely concludes that "the[] certifications were false, and known to have been false when made." City Compl. at ¶ 63. Milazzo provides more specificity, alleging that, as part of the required payroll submissions, "JKCC was required to certify that its payroll submissions were 'correct and complete.'" Milazzo Second Am. Compl. at ¶ 15; *see also* Pls.' Resp. Opp'n at 28 (defending the express certification theory with only the conclusory statement "Plaintiffs allege that Defendants expressly certified, or, in Kennedy's case, caused others to expressly certify—falsely—that JKCC had complied with the Hiring Provisions, including by submitting false payroll reports"). But knowing that the payroll reports were false and certifying that they were accurate are two different sins. Nothing in Milazzo or the City's complaint suggests that JKCC or Kennedy ever "affirmative[ly] misstate[d]" their compliance with the CRO, either on the certified payrolls themselves or on invoices submitted for payment. *Prose*, 17 F.4th at 742; *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 824 (7th Cir. 2011) (explaining that if the breaching party "falsely claims to be in compliance with the contract to obtain payment . . . there may be an actionable false claim"). *Compare, e.g., United States v. Luce*, 873 F.3d 999, 1001 (7th Cir. 2017) (false claims case predicated on false express

certification in a "Yearly Verification Report" that none of the corporate officers of the mortgagee were involved in criminal proceedings or investigations); *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1078 (N.D. Ill. 2016) (court concluded that the City had failed to allege claim under theory of express false certification, because the City did not assert that it received or relied on a completed form that required doctors to expressly certify that the services documented on the form were medically necessary); *Illinois ex rel. Strakusek v. Omnicare, Inc.*, No. 19 C 7247, 2021 WL 308887, at *11 (N.D. Ill. Jan. 29, 2021) (no express certification claim based on mere use of Medicaid provider identification number in electronic submission to Illinois Department of Public Aid, because "Relator has not alleged with particularity, as Rule 9(b) requires, the basis for his conclusion that the identification number conveys an affirmative misrepresentation that Defendants complied with the [Illinois Controlled Substances Act]").

The plaintiffs' implied certification theory is a better fit for the facts alleged, but still cannot survive the defendants' motion to dismiss. To adequately plead a cause of action premised on an impliedly false certification, Milazzo and the City must do more than plausibly allege that the defendants violated the CRO, even if JKCC employed a fraudulent scheme to do so—"[a] violation of a regulation 'is not synonymous with filing a false claim.'" *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 842 (7th Cir. 2018) (citation omitted); *see also United States ex rel. Lisitza v. Par Pharm. Cos.*, 276 F. Supp. 3d 779, 797 (N.D. Ill. 2017). Instead, "[a]bsent any specific misrepresentation on the face of the claims, the plaintiffs must identify omitted information that renders the description" of the goods or services for which payment is sought— here, construction services—misleading. *Id.* at 798; *see also Escobar*, 579 U.S. at 187.

Milazzo and the City argue that they have adequately "plead[ed] two forms of implied certification: the weekly payroll submissions and the invoices certified and submitted to the City

16

under JKCC's contracts." These submissions, they contend, impliedly falsely certified JKCC's compliance with the CRO in light of the fact that, "[a]s a prerequisite for payment, the City mandate[d] that weekly payroll submissions be certified and turned into the City with correct addresses and residency information for workers that performed labor on JKCC's contracts." Pls.' Resp. Opp'n at 29. So, the plaintiffs argue, JKCC's requests for payment—taking into account the invoices themselves, and the payrolls, falsely certified as accurate, submitted in conjunction with those formal requests for payment—"implicitly assur[ed]" the City that JKCC was in compliance with the CRO as it performed the work for which it was requesting payment. *Id.* at 28 (citing *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 711 n.7 (7th Cir. 2015)).

Standing alone, the invoices submitted for payment cannot be the basis for the plaintiffs' implied certification theory, because neither the City nor Milazzo alleges that the invoice submissions required JKCC to certify that it had performed the contracted-for work in accordance with statutory, regulatory, and contractual requirements. As a result, the plaintiffs have not satisfied the first prong of *Escobar*'s two-prong test for implied certification liability—there are no allegations that the actual invoices submitted for payment required JKCC to make "specific representations about the goods or services provided" or to do anything more than "merely request payment." *Escobar*, 579 U.S. at 190; *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

Alternatively, the plaintiffs seem to argue that even if JKCC was not required to make any specific representation about their compliance with the CRO, or with statutory, regulatory, or contractual provisions more generally, JKCC's provision of its workers' (false) address information and JKCC's payroll attestations that the information provided was true and accurate created a misleading impression that JKCC complied with the CRO. It is undisputed that the

standard payroll form JKCC submitted "required [it] to certify that its payroll submissions were 'correct and complete.'" Milazzo Second Am. Compl. at ¶ 30 and, as a result, the payrolls did make a "specific representation." The trouble is, however, that the representation pertained to the information contained within the form and not "about the goods or services provided." Saying that the residency information was accurate does not say anything about whether the invoices for the construction work performed were false in any sense; even considering the residency certification, the plaintiffs fail to satisfy *Escobar*'s requirement that the implied false statement say something false about the goods or services for which payment is being sought.

A further obstacle undermines the plaintiff's reliance on an implied certification theory. The plaintiffs' allegations suggest, and their theory seems to presume, that the certified payrolls were the City's designated mechanism for monitoring compliance with the CRO. *See, e.g.*, City Compl. at ¶ 106 ("Defendants repeatedly and intentionally omitted and concealed material information from the City about its workforce, including the residency of its workers, and submitted false information on its certified payroll reports to the City, with the intent to conceal its these [sic] violations of the CRO requirements from the City."). To some extent, this is borne out by the contract themselves. It's true, for example, that in each contract the provision setting out the CRO requirements indicates that "[c]ertified payroll reports (U.S. Department of Labor Form WH-347 or equivalent) must be submitted weekly to the Commissioner of the supervising department" and that the forms "shall identify clearly the actual residence of every employee on each submitted certified payroll." *See, e.g.*, City Compl. Ex. A at 33. And the payment procedure under each contract did require JKCC to include copies of the certified payrolls and other paperwork. *Id.* at 48. But the provisions addressing submission of the certified payrolls as a component of requests for payment indicate that "[c]ertified payrolls are required to assure EEO

18

compliance as well as wage compliance"—no mention of the CRO requirement is made in this section. *Id.* at 48. In a later section titled "Payroll Canvass Reports," however, the contract specifies that JKCC "must submit to the Commissioner with each pay request a Payroll Canvass Reports (PCR)" and makes clear that JKCC was required to submit PCRs "to indicate compliance with . . . the Chicago Residency Ordinance requirements." *See, e.g.*, *id.* at 58. Neither Milazzo nor the City mention "Payroll Canvass Reports" in their pleadings; there are no allegations that JKCC submitted false or misleading PCRs. But, because the City specifically designates the PCRs as the City's method of monitoring compliance with the CRO over the life of each contract, the plaintiffs' implied certification theory cannot rest on the mere submission of the inaccurate address information in the certified payrolls.

### c) Fraudulent Inducement

The plaintiffs also argue that they have adequately plead presentment based on a fraudulent inducement theory. The City alleges that it relied on JKCC's misrepresentations about its intention to comply with the CRO in deciding to award JKCC the relevant contracts, but that "[h]ad the City known that these claims were false, the City would never have entered into the DWM Contracts with JKCC." *See* City Compl. at ¶¶ 87-88, 96-97. "[W]here a person procures a contract by fraud, all claims under that contract are false for purpose of the FCA." *United States ex rel. McCarthy v. Marathon Techs., Inc.*, No. 11 C 7071, 2014 WL 4924445, at *5 (N.D. Ill. Sept. 30, 2014); *United States ex rel. Grenadyor v. Ukranian Village Pharmacy, Inc.*, 772 F.3d 1102, 1105 (7th Cir. 2014) ("If you say 'I agree' when you don't agree, you're making a false statement . . . Making a false promise in order to obtain something of value is fraud."). To allege fraud in the inducement, the plaintiffs "need[] to alert [JKCC] with the necessary specificity of how it allegedly misrepresented its compliance with a condition of payment in order to induce the government to enter into a contract." *Prose*, 17 F.4th at 741. "Claims of fraudulent inducement also require the plaintiff to

19

show that the defendant never intended to perform the promised act that induced the government to enter the contract." *Id.*; *Grenadyor*, 772 F.3d at 1105 (noting that, to the extent an initial promise that leads to a contract is false, the falsity "would have to be deliberate in order for the False Claims Act to apply"); *United States ex rel. Main v Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) ("But if the University knew about the rule [against paying capitation fees for recruiting students] and told the Department [of Education] that it would comply, while planning to do otherwise, it is exposed to penalties under the False Claims Act.").

Neither Milazzo nor the City has alleged with the required specificity facts supporting their contention that JKCC did not intend to comply with the CRO at the times it formed the relevant contracts with the City. The City alleges that "[i]n connection with the DWM Contracts, JKCC agreed to observe and comply with all applicable federal, state, county and municipal laws, statutes, ordinances and executive orders," including the CRO. City Compl. at ¶¶ 87-88. Both plaintiffs repeatedly assert that "JKCC did not intend to, and did not, comply with the residency requirement." *See, e.g.*, Milazzo Second Am. Compl. at ¶¶ 9(a)-(f). And, in briefing on the defendants' motion to dismiss, the plaintiffs argue that "[t]he fact that Defendants carried out the same fraudulent scheme over the course of multiple contracts with the City, which contained the same Hiring Provisions, is strong evidence (and for the purposes of a motion dismiss [sic] must be construed as evidence) that Defendants never intended to meet the conditions of payment in subsequently awarded contracts." Pls.' Resp. Opp'n at 30.

But as the Seventh Circuit observed in *Grenadyor*, conclusory allegations that JKCC intended to violate the CRO requirements at the time it agreed to generally comply with "all applicable federal, state, county and municipal laws, statutes, ordinances and executive orders" do not adequately plead fraudulent inducement, even at the motion to dismiss stage. 772 F.3d at 1106

("Missing from the complaint in this case are non-conclusory allegations that the pharmacy had decided to pay kickbacks at the time it promised otherwise by signing the 'I agree' statement."). It's possible, of course, that the plaintiffs are correct, and that JKCC never intended to comply with the CRO, but the facts alleged must do more than establish the possibility of fraudulent intent; they must make an inference of fraud plausible. *Grenadyor*, 772 F.3d at 1106 ("The requirement of pleading fraud with particularity includes pleading facts that make the allegation of fraud plausible.").

Contrasting *Grenadyor* with *Prose* illustrates the point. In *Grenadyor*, the Seventh Circuit affirmed the dismissal of a fraudulent inducement claim under the FCA resting on a conclusory allegation that the defendant pharmacy never intended to honor its certification. In order to participate in a Medicare reimbursement program, the pharmacy certified that it would not make kickbacks to its customers but that was not sufficient, the Seventh Circuit held, in the absence of additional allegations "showing that the 'I agree' statement was false when the pharmacy made it." *Grenadyor,* 772 F.3d at 1105. In *Prose*, however, the Seventh Circuit reversed the dismissal of a fraudulent inducement claim where it found the allegations that were missing in *Grenadyor*. Specifically, in *Prose* the defendant Medicaid healthcare provider was required, as a condition of receiving Medicaid reimbursement, to provide "Skilled Nursing Facility" services at nursing homes covered by its contract. The pleadings alleged not only that the defendant did not intend to provide those services, but that when it agreed to do so it knew that it could not do so because it had no qualified personnel under employment or contract who could provide SNF services and was doing nothing to try to fill the void. Prose, 17 F.4th at 738, 741-42. The complaint set forth deposition statements by the defendant's chief operating officer acknowledging that during the contract negotiations in which it agreed to provide SNF services, the defendant's "staff did not

have the ability or licensure to render [SNF] services. *Prose*, 17 F.4th at 742 ("Schoen acknowledged that Molina did not have the personnel available to perform those services. The complaint thus concludes that Molina did not and never intended to seek out another SNF service provider. This sufficed to allege intent.").

No similar allegations have been made in this case. Neither Milazzo nor the City has alleged that JKCC was categorically unable to comply with the CRO, based on the demographic makeup of its workforce or any other constraints. The plaintiffs point only to the fact that the defendants made the same promise, on which they failed to deliver, on each of the contracts at issue, contending that repeated nonperformance evidences the defendants' knowledge that they would not comply with the CRO requirement. But notably in *Grenadyor*, the Seventh Circuit rejected knowledge that future noncompliance was likely as a basis to infer intent not to comply from the outset. 772 F.3d at 1106 (Defendant "may have believed that sooner or later … it might have to yield, but that would be different from what is alleged in the complaint—that it '*never* had any intention of keeping that agreement'") (emphasis in *Grenadyor*). Such an inference, moreover, would be particularly unwarranted where, as here, the facts alleged fail to suggest a plausible reason why the defendant would have resolved not to perform as promised from the outset. Nothing alleged in either plaintiff's complaint suggests that it was beneficial to JKCC, financially or otherwise, to flout the CRO's requirements. Did JKCC have to pay Chicago residents higher wages? Were the requisite skills and experience unavailable in the city? In the absence of allegations from which one can plausibly infer that the defendants never intended to comply with the CRO, the plaintiffs' fraudulent inducement theory is inadequate to support liability under the presentment prongs of the false claim statutes and the City's ordinance.

22

2.   <u>False Records or Statements Material to a False or Fraudulent Claim</u>

The plaintiffs' second theory is that the defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim. JKCC's falsely attested-to payroll records likely are false records or contain false statements—the defendants do not appear to dispute this point. *See* Defs.' Memo. Supp. at 29 (citing a California case that held that weekly payroll reports "were records or statements made or used in support of" a defendant's requests for payment but were not themselves false claims). Because they have not adequately plead JKCC's submissions of "false or fraudulent claim[s]" for payment, however, the plaintiffs' "false statement" claims also fail.

That deficiency, however, would not similarly afflict the City's claim under the Business Preference Ordinance, which the plaintiffs press as a violation of the municipal False Statement Ordinance, MCC § 1-21-010, *et seq*. Unlike the FCO, the FSO does not require presentment of a claim for payment; rather, it proscribes the making of any "false statement of material fact to the city … in connection with a bid, proposal, contract or economic disclosure statement …." *Id.*  at 1-21-010(a). The defendants offer a number of other arguments as to why the City's claims under the Business Preference Ordinance are not actionable, *see* Defs.' Memo. Supp. at 16-19, but the Court need not address them presently in view of its conclusion below that the City's complaint inadequately pleads the materiality of JKCC's representations that it qualified for the Chicago Business Preference. In any event, several of the defendants' arguments are fact-based and cannot appropriately be resolved on a motion to dismiss, *see id.* at 18-19 (arguing that JKCC "qualified for the preference as defined in the contracts," contrary to the City's allegations; that the requirements outlined in the complaint are different than the standard that governed JKCC's attestations actually submitted) or are breach of contract defenses, not an argument that the City

23

has no claim for breach of contract, *see id.* at 17 (arguing that the definition of "Chicago business" is ambiguous and so the provision is unenforceable).

        3.  <u>"Reverse Claim"</u>

The plaintiffs' third false claim theory is that the defendants knowingly made or used false records or statements material to an obligation to pay money to the government, or otherwise knowingly concealed or knowingly and improperly avoided or decreased such an obligation. The plaintiffs' claim under this subsection of the relevant statutes—Section 3729(a)(1)(G) for the federal False Claims Act, Section 175/3(a)(1)(G) of its state counterpart, and Section 1-22-020(7) of the Chicago municipal ordinance—is not clearly spelled out, but seemingly rests on the contracts' quantification of specific damages to the City for each percent that JKCC fell below the contracts' requirements for total work hours that must be performed by City residents. Under this "reverse claim" approach, JKCC's alleged obfuscation of the actual amount of work done by City- and non-City residents, respectively, amounted to a knowing and improper concealment or avoidance of an obligation to pay money to the government.

An entity is liable for a "reverse claim" if it conceals, avoids, or makes false statements to conceal or avoid an "obligation" to pay or transmit money or property to the government. The federal and state false claim statutes define an "obligation" to encompass, in relevant part, "established dut[ies], whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship . . . or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3); 740 ILCS 175/3(b)(3). Several courts have explained that "it is . . . black-letter law that one does not incur reverse-false-claim liability by violating, and affirmatively concealing one's violation of, a statute, regulation, or contract that merely authorizes the Government to levy certain fines and penalties." *United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 270 (D.D.C. 2016); *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 285 F.

Supp. 3d 44, 53-54 (D.D.C. 2017) (concluding that defendants' failure to report substantial risk information and pay penalties to the EPA did not create "reverse claim" liability, because "[a]n unassessed, contingent penalty is not an FCA 'obligation' subject to suit" under that provision).

But those cases primarily address a situation where the defendant's violation would entitle a governmental entity to assess civil penalties through some separate administrative process. In this case, JKCC's contract with the City contained a penalty clause that, as written, operated more like a liquidated damages provision—the clause made clear to JKCC, at the time of contracting, the exact cost of noncompliance and instructed that the City shall be considered damaged in that amount if the fifty percent minimum is not satisfied. Several courts have seized on this distinction, suggesting that non-discretionary contract-based liquidated damages do constitute an "obligation" for "reverse false claim" purposes. *See, e.g.*, *United States ex rel. Keen v. Teva Pharms. USA Inc.*, No. , 2017 WL 36447, at *5-6 (N.D. Ill. Jan. 4, 2017) (*United States ex rel. Boise v. Cephalon, Inc.*, No. 08-287, 2015 WL 4461793, at *6 (E.D. Pa. July 21, 2015) (denying motion to dismiss "reverse false claim" predicated on contract-based stipulated damages, because the defendant's "contractual obligation to pay the government is an 'established duty' as contemplated by § 3729(b)(3)); *Ruscher v. Omnicare Inc.*, No. 4:08-cv-3396, 2014 WL 4388726, at *5 (S.D. Tex. Sept. 5, 2014) ("[T]he Fifth Circuit in *Marcy* explicitly acknowledged that obligations arising out of a contract were different from the statutory fines and penalties that it held were insufficient to state a claim under § 3729(a)."). *Cf. Am. Textile Mfs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 741 (6th Cir. 1999) (affirming dismissal of a false claims act "reverse claim" count where the alleged obligation would arise "only after administrative investigation and a decision to notify the defendant that the government seeks payment of the liquidated damages it believes are due"); *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 278-79 (E.D. Pa. 2020) (noting that some

25

cases "have concluded that the contractual nature of the stipulated penalties by itself makes them 'obligations'" while other courts have "looked beyond the fact of the contract to its terms, concluding that where stipulated penalties are contingent on the exercise of governmental discretion, they are not 'obligations'"); *United States ex rel. Howard v. Caddell Const. Co.*, No. 7:11-cv-270-FL, 2021 WL 1206584, at *32 (E.D.N.C. Mar. 30, 2021) (holding that the plaintiff's § 3729(a)(1)(G) failed as a matter of law because the defendants' breach did not "result in an automatic obligation to pay separate liquidated damages, but rather trigger[ed] an administrative process for determining liquidated damages, if any"). Unlike in other cases, the contract provisions at issue here do not just "describe a possible future duty" that "are more akin to regulatory fines than to typical contractual liquidated damages"—JKCC's obligation under each contract to pay damages for a shortfall in total hours worked by City workers was an "established duty" that did not depend on an exercise of governmental discretion. *Sturgeon*, 438 F. Supp. 3d at 279. As such, it plausibly constitutes the type of obligation described in § 3729(a)(1)(G) and the state and municipal analogs.

The Court will not resolve this question, however, because neither party has addressed it. Although the defendants moved to dismiss "all claims asserted by Plaintiff-Relator Angelo Milazzo . . . and Plaintiff City of Chicago," Defs.' Memo. Supp. at 1, they failed to offer any developed argument to support dismissal of the plaintiffs' claims under the reverse claim statutes and ordinance. [cite] It might be argued that the plaintiffs "waived the waiver" by failing to assert waiver in response to the defendants' motion, *See generally* Pls.' Resp. Opp'n (failing to mention "reverse claims" at all). [cite], it could also be said that the defendants waived any waiver by the plaintiffs by failing to assert it in their reply brief. In short, there might be a viable challenge to the plaintiffs' "reverse claim" theory, which is largely ignored in the complaints, but it is, at bottom,

the defendant's responsibility to develop and set forth the arguments for dismissing a complaint for failure to state a claim. They have not offered any specific argument addressing the reverse claim theory set forth in the complaints, however, and so have no cause to complain of the denial of their motion as to that theory. This failure does not save the plaintiffs' presentment claim, however, because, as discussed below, the Court concludes that the complaints fail to plausibly allege materiality.

### C. Milazzo and the City Have Failed to Adequately Plead Materiality

The defendants have also moved to dismiss on the basis that Milazzo and the City have not adequately pleaded that JKCC's alleged misrepresentations regarding its compliance with the CRO or eligibility for the Chicago Business Preference were material. Materiality is an element of the plaintiffs' false claims and false statement causes of action. A party's "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 192. "Material" is statutorily defined to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). But the statute's materiality requirement "descends from 'common-law' antecedents," and "[u]nder any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Escobar*, 579 U.S. at 193. Because it is not an "all-purpose antifraud statute," the FCA's materiality standard is a "demanding" one— the Government's decision to designate compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment "is relevant, but not automatically dispositive" in evaluating materiality, but it is not "sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 194.

In the defendants' view, the plaintiffs' allegations "provide[] no indication 'that the Government's decision to pay would have been different had it known of the alleged' misrepresentations." Defs.' Memo. Supp. at 21-22, 24-25. They argue that the plaintiffs have not alleged "that violations of the CRO . . . *routinely* lead the City to decline to pay these types of claims," and note, instead, that "[e]ven after the City learned about the alleged fraud by the filing of the Relator's Complaint on April 24, 2017, the City proceeded to close out jobs with JKCC." *Id.* at 24-25. The plaintiffs argue that the City uses residency requirements in its contracts because such requirements "serve important social goals for the City, including that City residents have the opportunity to work on projects commissioned and funded by the City" and that the "City takes residency requirements so seriously that it routinely fires City employees who violate those policies." Milazzo Am. Compl. at ¶¶ 10-11. As such, they contend that "[h]ad the City known that JKCC's alleged misrepresentations regarding their compliance with the CRO were false, the City "would have terminated the DWM Contracts with JKCC and/or would have refused to pay JKCC's false and fraudulent invoices." City Compl. at ¶ 96. And Milazzo and the City maintain that these allegations suffice at the motion to dismiss stage, because the question of "the 'likely or actual behavior' of the City" in response to the fraud "is inherently a fact question"; they argue that factors such as when the City learned of the alleged fraud, whether the City continued to pay JKCC after that point, how the City generally responds when contractors fail to comply with the CRO, the centrality of the Hiring Provisions to the City's contracting goals, and what information is recordable in the City's online reporting system are all factual questions that cannot be answered on the pleadings and, as a result, should not be considered at this stage. Pls.' Resp. Opp'n at 25.

As an initial matter, the plaintiffs' argument that materiality is a fact question inappropriate to consider on a motion to dismiss is unconvincing. The Supreme Court considered and rejected

this argument in *Escobar*, reasoning that "[t]he standard for materiality . . . is a familiar and rigorous one" and that "False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." *Escobar*, 579 U.S. at 195 n.6. Since *Escobar*, courts in this district have dismissed FCA claims at the motion to dismiss stage where a relator or plaintiff has failed to offer more than "conclusory allegations" about the materiality of a misrepresentation to a government payment decision. *See, e.g.*, *United States v. Molina Healthcare of Ill., Inc.*, No. 17 C 6638, 2019 WL 3555336, at *3 (N.D. Ill. July 31, 2019) (granting a motion to dismiss because "[e]ven if Relator's Complaint had sufficient particularity, it would separately fail the FCA's materiality requirement"); *Illinois ex rel. Strakusek v. Omnicare, Inc.*, No. 19 C 7247, 2021 WL 308887, at *14 (N.D. Ill. Jan. 29, 2021) (dismissing counts under the IFCA because Relator failed to "connect [] [his assertions of materiality] to factual allegations about how officials in the Illinois Medicaid program respond" to alleged misrepresentation). To the extent that the parties disagree about the accuracy of the City's or Milazzo's factual allegations, the Court assumes their truth, but that does not relieve the plaintiffs from their obligation to make factual allegations plausibly supporting materiality in the first place. *See, e.g.*, *Prose*, 17 F.4th at 743 ("The complaint must include allegations that show that the omission significantly affected the government's actions.").

The plaintiffs have not satisfied that obligation here. The Seventh Circuit has emphasized that, post-*Escobar*, it is not enough for a false claims plaintiff "simply to say that the government required compliance with a certain condition for payment"; instead, "[t]he facts must indicate that the government actually attaches weight to that requirement and relies on compliance with it." *Prose*, 17 F.4th at 740. The parties do not dispute that JKCC's contracts included potentially "substantial penalties for non-compliance with the residency requirements." Pls.' Resp. Opp'n at

26. But neither Milazzo nor the City—which is, as the plaintiffs point out, "the entity controlling payment under the DWM Contracts" and therefore "in the best position to know how the City would have acted if it had known that Defendants were committing fraud"—allege that the CRO compliance penalty provisions have *ever* been enforced, let alone that they are enforced routinely or in most cases where a contractor is ultimately non-compliant. *See, e.g.*, *Escobar*, 579 U.S. t 194-95 ("[P]roof of materiality can include, but is not necessarily limited to, evidence that . . . the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement."). Milazzo offers only the observations that "[t]he City uses residency requirements in many areas of City government"; that "the requirements serve important social goals for the city, including that City residents have the opportunity to work on projects commissioned and funded by the City"; and that the City "routinely fires City employees who violate those policies." Milazzo Second Am. Compl. at ¶¶ 11-12. And the City, the entity with the most insight into how non-compliance is addressed, merely alleges that "[had] the City known that [JKCC's alleged misrepresentations] were false, the City . . . would have terminated the DWM Contracts with JKCC and/or would have refused to pay JKCC's false and fraudulent invoices." Pl.'s Resp. Opp'n at 26, *citing* City Compl. at ¶ 97.

These are the type of conclusory allegations of materiality that *Escobar* held to be inadequate. *Escobar*, 579 U.S. at 193-95. Milazzo and the City have failed to connect their materiality arguments to fact allegations about how officials in the City department monitoring CRO compliance respond to non-compliant contractors. "Such bald assertions of materiality amount to no more than 'threadbare recitals of the elements of a cause of action' and are not sufficient under Rule 8, let alone 9(b)." *Nedza v. American Imaging Management, Inc.*, 2019 WL 1426013, at *7 (N.D. Ill. Mar. 29, 2019). That there are contractually defined penalties for non-

compliance is not, standing alone, sufficient; "[i]n its discussion of materiality in *Escobar*, the Supreme Court considered and rejected sweeping contractually-imposed materiality irrespective of whether payment is actually contingent on compliance." *Id.*[1]

The City's complaint has the same shortcomings with respect to the materiality of JKCC's alleged misrepresentations regarding its eligibility for the Chicago Business Preference. Five of the six contracts at issue "allowed prospective bidders to apply for the Chicago Business Preference" and JKCC "submitted an affidavit on each" of those five contracts "attesting that JKCC was eligible for the Chicago Business Preference because it was a City-based business." City Compl. at ¶¶ 69-70. The City alleges that each statement made in those affidavits was false: that JKCC is not and never has been a City-based business; that JKCC is not a business located within the City's corporate limits; and that JKCC did not maintain, at the relevant times, most of its regular full-time workforce within the City. *See id.* at ¶¶ 72-80. But beyond stating that "[s]ince 2009, the City has paid approximately $197,177,866.00 to JKCC under the DWM Contracts," *id.* at ¶ 119, and indicating that there is a "bid preference" to qualified City-based businesses, *id.* at ¶ 67, the City pleads no facts supporting its contention that JKCC's alleged misrepresentation was material to its decision to award JKCC the contracts at issue. As described by the City, the bid preference gives prime contractors an advantage only in narrow circumstances—when a City-

_____

[1] The defendants also contest the accuracy of the City's assertion that it would have stopped payment to JKCC on the relevant contracts had it known of JKCC's alleged misrepresentations, in light of the fact that "[e]ven after the City learned about the alleged fraud by the filing of Relator's Complaint on April 24, 2017, the City proceeded to close out jobs with JKCC." Defs.' Memo. Supp. at 25 & n.7 (urging that "[a]t a minimum, claims based on submissions after April 24, 2017 must be dismissed"). That argument, however, relies on information outside the pleadings; the allegations of the City's complaint on which this argument is based (¶¶ 24-25) allege only when the contracts ended, not how they ended or whether there was any attempt to enforce the Business Preference penalties. While that information would be probative, it is not included in either of the complaints.

based business submits the second-lowest bid for a project behind a non-City-based business. But here, the City does not plead, even in conclusory terms, that JKCC was awarded the contracts at issue through the application of this bid preference, or that JKCC's representations that it was a City-based business otherwise impacted its decision to award it the contracts in this case. For all we know, JKCC was the low bidder on each of the contracts and received no benefit at all from the preference. As such, its allegations of materiality are entirely insufficient.

The materiality analysis to this point has focused on the likely impact of JKCC's alleged misrepresentation on the City's payment decisions, as the source of funding for many of the contracts at issue and the entity interacting directly with JKCC. But the Court also requested supplemental briefing to aid its analysis of whether, to adequately plead and prevail on his federal false claim counts, Milazzo needs to allege that the federal government would likely have changed its payment decisions if it knew that JKCC was violating the CRO—i.e., that JKCC's representations regarding its compliance with the CRO were material to the federal government directly, rather than merely material to the payment decisions of a federal grantee. *See* Minute Entry, ECF No. 95.

In *Escobar*, the Supreme Court endeavored to "clarify how th[e] materiality requirement should be enforced," and instructed parties and courts that the "demanding" standard "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation" 579 U.S. at 193, *citing* 26 R. LORD, WILLISTON ON CONTRACTS § 69.12, p. 549 (4th ed. 2003). In most federal false claims cases, that standard is straightforward enough to apply, because the federal government is both the source of the funds being distributed and the recipient of the alleged misrepresentation. But the materiality inquiry is potentially more complicated when the federal government is the source of the allegedly fraudulently secured funds but the alleged

misrepresentation is made to a third-party—and particularly in a case like this one, where the misrepresentation may go to the "essence of the bargain" between the third party and the defendant based on the third party's idiosyncratic preferences but may have no bearing on the federal government's funding decision.

The legal question of whether a relator is required to plead the materiality of alleged misrepresentations to both the municipal government (or other third-party administering federal funds) and the federal government seems to be one of first impression in this circuit and an issue that has not been widely addressed by other courts. The plaintiffs argue that "as a matter of law, alleged fraud on a municipal contract partially funded by the federal government is material to the federal government if it is material to the municipal government." Pls.' Suppl. Br. 6, ECF No. 96. The defendants, on the other hand, urge that the federal false claims statute "does not apply to fraud against *any* federal grantee," that there must be a "sufficient nexus between the alleged fraud and the government funds," and that Milazzo has not offered "any factual allegations to support a claim that the violation of the CRO"—which the defendants characterize as "further[ing] the parochial interests of the City, with no discernible federal interest present"—"was material to the federal government's funding decision." Defs.' Suppl. Br. 3-4, ECF No. 97, *citing Garg v. Covanta Holding Corp.*, 478 F. App'x 736, 741 (3d Cir. 2012). The defendants reject the notion that it is "sufficient [under the federal false claims act] merely to allege that failure to adhere to the CRO was material to the City of Chicago" and emphasize that, though "the claim need not be made directly to the federal government" under the FCA, the claim "must at least form the basis on which the federal monies are received." *Id.* at 5.

In support of its argument that a contractual term is per se material under the federal False Claims Act if the entity administering the disbursement of federal funds deems it material, the City

points to *Escobar* and other cases that analyzed materiality with a focus on the likely impact on the payment decisions of the intermediary-recipient of the alleged misrepresentation. *See* Pls.' Suppl. Br. 4-8. But those cases are distinguishable from this one in at least one highly significant respect: in each, the misrepresentation at issue related either to the defendant's compliance with federal statutes or regulations or to state regulations bearing directly on the nature of the good or service for which the federal government was paying. In those cases, there was no question that the federal government would consider the defendants' misrepresentations regarding their compliance just as material to its funding decisions as the direct recipients of the alleged misrepresentations. *See, e.g.*, *United States ex rel. Escobar v. Univ. Health Servs., Inc.*, 842 F.3d 103, 108, 110-11 (1st Cir. 2016) (alleged misrepresentations pertained to the defendant's compliance with MassHealth's licensing and supervisory requirements for mental health facilities, and Medicaid was billed for care and medications provided and prescribed by individuals without the proper licenses to do either); *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 635-36 (7th Cir. 2016) (pre-*Escobar* decision in which the relator alleged that Kmart misrepresented that it was charging Medicare Part D beneficiaries the "usual and customary" price, as required and defined by federal Medicare regulations); *Kelly v. Denault*, 374 F. Supp. 3d 884, 891-92 (N.D. Cal. 2018) (defendant's misrepresentations to the county housing authority regarding compliance with state and local law undermined HUD's purpose in federally funding the housing voucher program, which, per federal regulation, was to ensure that "eligible families can afford decent, safe, and sanitary housing" and implicated additional federal regulations prohibiting side-payments, overcharges, and federal approval of tenancy if rent is unreasonable); *United States ex rel. Int'l Bhd. of Elec. Workers Local Union No. 98 v. Farfield Co.*, 438 F. Supp. 3d 348, 362 (E.D.

Pa. 2020) (defendant's alleged misrepresentations pertained to its compliance with the federal Davis-Bacon Act governing worker classifications, prevailing wage rates, and fringe benefits).

The statutory language and legislative purpose both lend support to the idea that a federal FCA plaintiff must plead that the alleged fraudulent misrepresentation is material to the federal government's funding decisions. First, the statutory language reinforces the notion that the federal government disburses funds for a particular purpose; its objectives must be considered when evaluating whether a fraudulent misrepresentation goes to the "very essence of the bargain" between the federal government and the entity receiving funds to carry out its purpose. *Escobar*, 579 U.S. at 193 n.5. The federal false claims act reaches false claims "made to a contractor, grantee, or other recipient" if the federal government has provided or will reimburse the funds and "if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest." 37 U.S.C. § 3729(b)(2)(A)(ii). So, even when federal funds are disbursed through an intermediary, as here, the federal government's funding decision was ultimately made to further its own programs or interests; those interests may or may not align with the intermediary's, but the federal government's objectives and priorities for the use of that money cannot be disregarded in a materiality analysis simply because the federal government is not distributing the money directly.

Second, the statute's legislative history and purpose are clear—the statute is concerned with preventing loss to the federal government and treasury, not on punishing all fraud involving federal funds. Congress passed the federal False Claims Act to "stop [the] plundering of the public treasury" that contractors had engaged in through the "bill[ing] for nonexistent or worthless goods, charg[ing of] exorbitant prices for good delivered, and general[] robb[ery] in [the government's] purchasing [of[ the necessities" for running an effective government. *United States v. McNinch*,

356 U.S. 595, 599 (1958). In amending the federal statute to reach false claims made to government contractors, grantees, or other funding recipients, the Senate rejected the view adopted by some courts that "once the United States had made the grant to the State, local government unit, or other institution, it substantially relinquishes all control over the disposition of the money." S. REP. NO. 99-345, at 21 (1986). Instead, it posited that false or fraudulent claims "submitted to State, local, or other private programs funded in part by the United States" may threaten the federal treasury in much the same way as false claims submitted directly to the federal government for payment—at least in those cases "where there is significant Federal regulation and involvement." *Id.* at 22. Nonetheless, the statute is not, and never has been, a tool "designed to reach every kind of fraud practiced on the Government" or government funds, *McNinch*, 356 U.S. at 599, but only encompasses those claims that, if paid, "would ultimately result in a loss to the United States." S. REP. NO. 96-615, at 4 (1980).

In line with this analysis, the courts that have addressed this issue have squarely rejected the argument that the only relevant question was the materiality of the alleged fraudulent misrepresentations to third party rather than to the government. In *United States ex rel. Petratos v. Genentech, Inc.*, the Third Circuit concluded that "since the Government decides on payment . . . it is the Government's materiality decision that ultimately matters" and observed that, "because the False Claims Act was passed to protect the federal treasury," "it would make little practical sense to give [an intermediary's] materiality determinations dispositive weight." 855 F.3d 481, 489-92 (3d Cir. 2017) (characterizing the relator's attempts to focus the court's "inquiry solely on the [intermediary's] materiality determination," as "tr[ying] to pass off restyled causation arguments as proof of materiality"); *see also United States ex rel. Freedman v. Bayada Home Health Care, Inc.*, No. 3:19-cv-18753-FLW-ZNQ, 2021 WL 1904735, at *8-9 (D.N.J. May 12, 2021) ("Because

[the relator] has not pled that compliance with the [provisions in the Request for Contracting Proposals] or its sister state regulations regarding lobbying fees goes to the essence of his relationship with Medicare, he has not plausibly alleged materiality in the sense of the FCA.") And even the plaintiffs' own formulation of their argument—that an alleged misrepresentation "is material to the federal government if it is material to the municipal government" or other grantee— implicitly concedes that the weight the federal government attaches to an alleged misrepresentation *does* matter, though Milazzo and the City would be able to dodge the issue with their proposed per se rule imputing the grantee's materiality assessment to the federal government. Pls.' Suppl. Br. at 6. For those reasons, the Court concludes that where, as here, the allegedly fraudulent misrepresentations were made to a to a "contractor, grantee, or other recipient" disbursing federal funds under Section 3729(b)(2)(ii), a relator must plead that the misrepresentations are material to the federal government's funding decision as well as those of the contractor, grantee, or other funding recipient.

Finally, as a factual matter, it appears that the City's local policy goals—accomplished through incorporation of the CRO requirements into its public works contracts—and the federal government's policy goals—as outlined in the provisions on Section 3 compliance—may be in conflict. *See* City Compl. Ex. F at 125-26. In this case, HUD funded the City of Chicago Department of Water Management's "Augusta Boulevard Sewer Improvement" project through a "Community Development Block Grant." *Id.* at 123. According to the additional HUD CDBG-DR special funding conditions, JKCC "agree[d] to comply with HUD's regulations in 24 CFR part 135." *Id.* at 126. Section 3 of the Housing and Urban Development Act of 1968 aims to "ensure that employment and other economic opportunities generated by HUD assistance or HUD-assisted projects covered by section 3, shall, to the greatest extent feasible, be directed to low- and very

low-income persons, particularly persons who are recipients of HUD assistance for housing." *Id.* City residency is not synonymous with the need for housing assistance, so the City's complaint tells us nothing about whether this requirement is in conflict with the City's residency goals,[2] and the potential for conflict between the goals of the federal government and the City undermines the plaintiffs' contention that "alleged fraud on a municipal contract partially funded by the federal government is material to the federal government if it is material to the municipal government." Pls.' Suppl. Br. at 6.

In sum, because the plaintiffs have failed to adequately plead that JKCC's allegedly fraudulent misrepresentations regarding their compliance with the CRO and their eligibility for the Chicago Business Preference were material, Milazzo's federal, state, and municipal false claims counts (Counts I through VI) and the City's municipal false claims and false statement counts (Counts I and II) cannot survive the defendants' motion to dismiss.

### D. The City's Allegations against Kennedy as an Individual Are Insufficiently Particularized as to His Role in the CRO Scheme

Joel Kennedy also argues that the allegations against him, in his individual capacity, are inadequate to survive the particularized pleading requirements in Rule 9(b). Kennedy contends that the "City's Complaint lacks a single assertion about [his] purported role in the scheme" and that the City points to "only three assertions regarding Kennedy in its entire complaint: (1) that he is the President and owner of JKCC; (2) Relator and Mike Patti reported to him; and (3) 'JKCC committed the fraud and other violations alleged herein through, at a minimum, its senior

---

[2] For example, for projects like the Augusta Boulevard Sewer Improvement project, section 3 compliance is achieved through the contractor's employment of Section 3 workers to complete "25 percent or more of the total number of labor hours worked by all workers" on the project. U.S. Dep't of Housing & Urban Dev., *Frequency Asked Questions for Section 3* (Mar. 25, 2021) (available at https://www.hud.gov/sites/documents/11SECFAQS.PDF).

employee, Michael Patti, its President and owner Kennedy, and/or its other officers.'" Defs.'
Memo. Supp. at 34, *citing* City Compl. at ¶¶ 8, 58, 60, and 56. In the City's view, the who, what,
when, where, and how of the fraud alleged is adequately described—particularly here, where, it
contends, the details of the fraud are "within the defendant's exclusive knowledge." Pls.' Resp.
Opp'n at 36-37. The City also points to additional allegations such as the "specifics of Defendants'
residency fraud scheme . . . and, similarly, the specifics of Defendants' fraud regarding the
Chicago Bid Preference," that it maintains are "well-pled allegations . . . calculated to give
reasonable notice to JKCC and Kennedy of their 'purported role in the scheme.'" *Id.*

The Court agrees that the City has not pleaded, with sufficient particularity, Kennedy's
individual role in the alleged fraudulent CRO scheme. As the defendants note, Kennedy's role as
owner and supervisor is not, standing alone, sufficient to adequately allege his involvement in
fraud carried out by his subordinates, even when those subordinates are acting within the scope of
their employment. *See, e.g.*, *United States ex rel. Bender v. N. Am. Telecomms.*, 686 F. Supp. 2d
46, 53-54 (D.D.C. 2010) (explaining that an FCA complaint must make specific allegations against
individual defendants, rather than against them as a group, and concluding that "it is not enough
for a complaint to refer generally to 'management'. . . without explaining the role individual
defendants played in the fraud"). But, contrary to Kennedy's characterization, those are not the
only specific allegations offered against him—the City makes additional allegations that
"Defendants" "regularly omitted workers who resided outside of the City from certified payrolls,"
City Compl. at ¶ 44, "submitted false City addresses for non-City workers on the DWM contracts,"
*id.* at ¶ 49, and "submitted false information about which of JKCC's employees worked on which
of the DMW contracts," *id.* at ¶¶ 52-53. "Defendants" includes Joel Kennedy, and at this point,

the Court is obligated to accept the City's allegations that Kennedy was personally involved in the fraudulent conduct described as true.

Had the City included only the allegations described above, its claims against Kennedy pertaining to the alleged CRO fraud may have survived, even under the heightened Rule 9(b) pleading standard. However, the City undermined its own allegations with the internal inconsistencies within its complaint. For example, after describing, in detail, the alleged fraudulent scheme, the City alleges that "JKCC committed the fraud and other violations alleged herein through, at a minimum, its senior employee, Michael Patti II . . . , its President and owner Kennedy, *and/or* its other officers, directors, employees, agents, and/or personnel." *Id.* at ¶ 56 (emphasis added). This allegation seems to concede that Kennedy may have not been personally involved in the commission of the fraud at all; the allegation allows for the possibility that Patti carried it out with the help of unnamed JKCC officers and employees other than Kennedy. That inconsistency is compounded by the City's allegations that Kennedy is liable because he "knew or should have known" of the falsity of JKCC's payroll certifications, Compl. at ¶ 65, and their argument that Kennedy was involved because he either "directly supervised the employee responsible for submitting the falsified payroll reports to the City—Michael Patti ("Patti")—or directly supervised Patti's direct supervisor." Pls.' Resp. Opp'n at 36, *citing* City Compl. at ¶¶ 58, 61. A business owner's reckless disregard for the truth or falsity of claims submitted by his business may warrant false claims liability. *See, e.g.*, *United States v. Stevens*, 605 F. Supp. 2d 863, 869 (W.D. Ky. 2008) (recognizing that an individual employee's actions in "deliberate ignorance or reckless disregard of the truth or falsity of the information is sufficient to prove knowledge" and that "in the healthcare setting, a physician demonstrates 'reckless disregard' when he fails to take steps to ensure that his clinic's claims for government reimbursement are accurate"). But "should have

known" is the language of negligence, not fraud; if Kennedy lacked knowledge because he was careless rather than reckless or willfully blind, he committed no fraud. The allegations that Kennedy "knew or should have known" about fraud carried out by his subordinates, moreover, are conclusory; the City has not plead facts suggesting that Kennedy was either aware of and directing the implementation of the CRO scheme or aware and turning a blind eye to it.

With these conflicting accounts of Kennedy's personal involvement in the fraudulent conduct alleged, the complaints' other deficiencies, such as allegations about when, specifically, Kennedy omitted names or falsified addresses in the nine-year span encompassed by the contracts in the complaint, become more concerning. The City has certainly described the "who, what, when, where, and how" of a fraudulent scheme perpetrated by JKCC; what remains unclear is how, if at all, Kennedy was personally involved in executing the CRO scheme.

The City's allegations regarding Kennedy's involvement in the Chicago Business Preference scheme, by contrast, are adequate under Rule 9(b). The plaintiffs allege that Kennedy personally signed each of the affidavits submitted in support of JKCC's status as a City-based business. *See* City Compl. Ex. G (each "Affidavit of Chicago Business" requesting JKCC's consideration for the Chicago business preference was both signed by Kennedy and sworn by Kennedy to a notary public). Should the City replead or continue to pursue its claims predicated on the Chicago Business Preference, its description of Kennedy's role in the scheme will suffice under Rule 9(b).

### E.      JKCC's Other Arguments for Dismissal Fail

1.   JKCC's Arguments Regarding the Constitutionality of the Chicago Residency Ordinance and Chicago Business Preference Cannot Be Resolved on a Motion to Dismiss.

As an initial matter, the defendants argue that both the Chicago Residency Ordinance and the Chicago Business Preference are unconstitutional—therefore, they argue, the City and Milazzo

cannot predicate their false claim, false statement, breach of contract, or consumer fraud claims on the defendants' alleged misrepresentations regarding its compliance with the City's ordinances or on JKCC's noncompliance itself. Defs.' Memo. Supp. at 15-16. However, the defendants' challenge to these provisions under Article IV's Privileges and Immunities Clause are not appropriately resolved on a motion to dismiss.

The Chicago Residency Ordinance and the Chicago Business Preference prioritize and incentivize the utilization of City-based businesses and City residents in public works contracts. The Chicago Residency Ordinance, MCC § 2-92-330, requires that at least fifty percent of the total number of hours worked on City contracts valued at more than $100,000 be performed by city residents and at least 7.5% of the total number of work hours be performed by project area residents.[3] This requirement was incorporated into each of JKCC's contracts with the City, as required by the ordinance. MCC § 2-92-330(b) ("Implementation of the requirements established in subsection (a) of this section will be achieved by including in contracts and subcontracts described therein the following language . . . ."); *see, e.g.*, City Compl. Exs. A-E at 32-33 (contractual language incorporating the CRO's requirements), City Compl. Ex. F. at 35-36 (same). The City warned that "[g]ood faith efforts on the part of the contractor to provide utilization of actual Chicago residents shall not suffice" and the parties agreed that for "each percentage of shortfall toward the stipulated residency requirement," the contractor would surrender to the City "1/20 of 1 percent (.05%), 0.0005, of the approved contract value." *See, e.g.*, City Compl. Ex. A. at 33. The Chicago Business Preference similarly prioritizes Chicago-based businesses; if a non-City business submits the lowest bid for a City contract, the ordinance directs the Chief

---

[3] The ordinance defines "city residents" to mean "persons domiciled within the city" and "project area residents" to mean "persons domiciled within that part of the city designated as the project area in the information for bidders issued by DPS." MCC § 2-92-330(a-1).

Procurement Officer to award the contract to a City-based business if its bid falls within two percent of the lowest bid. *See, e.g.*, City Compl. Ex. A at 101.

The defendants urge that both ordinances unconstitutionally discriminate against out-of-state residents, relying heavily on the Supreme Court's analysis of a similar residency ordinance enacted by the city of Camden, New Jersey. *See United Bldg. & Const. Trades Council of Camden Cty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208 (1984) ("*Camden*"). The defendants argue that, as in *Camden*, the residency ordinance and business preference implicate Article IV's Privileges and Immunities Clause and can only be upheld if the City shows a "substantial reason" for the difference in treatment between in-state (or in-city) and out-of-state residents. Defs.' Memo. Supp. at 12. The defendants further insist that the City cannot adequately justify either ordinance, and that the City's failure "even to put forth a non-discriminatory reason for the CRO" warrants both an "assess[ment of] the facial invalidity of the ordinance," and, ultimately, dismissal at the pleading stage. Defs.' Reply 11, ECF No. 73.

But whether either ordinance violates the Privileges and Immunities Clause is a question that cannot be definitively answered at this stage in the proceedings. "Application of the Privileges and Immunities Clause to a particular instance of discrimination against out-of-state residents entails a two-step inquiry": first, "whether the ordinance burdens one of those privileges and immunities protected by the Clause," and second, if so, "whether there is a 'substantial reason' for the difference in treatment" between in-state and out-of-state individuals. *Camden*, 465 U.S. at 218-22.

*Camden* directly answered the first half of the inquiry. The Court concluded that residency ordinances "bias the employment decisions of private contractors and subcontractors against out-of-state-residents" and that the "opportunity to seek employment with . . . private employers is

43

'sufficiently basic to the livelihood of the Nation' . . . as to fall within the purview of the Privileges and Immunities Clause," even where contractors and subcontractors are engaged in projects funded, in part or in whole, by a city. *Id.* at 221-22.

But the *Camden* Court expressly declined to evaluate Camden's justifications for the residency ordinance on the record before the Court, as "[n]o trial ha[d] ever been held" and "[n]o finding of facts ha[d] been made." *Id.* at 223. Instead, the Court remanded the case to allow for appropriate factual determinations to be made. And in doing so, it observed that "[e]very inquiry under the Privileges and Immunities Clause 'must . . . be conducted with due regard for the principle that the states should have considerable leeway in analyzing local evils and in prescribing appropriate cures," and that "caution is particularly appropriate when a government body is merely setting conditions on the expenditure of funds it controls." *Id*. at 222-23. In fact, the Court went so far as to say that, though the Camden ordinance fell within the purview of the Privileges and Immunities Clause, "[t]he fact that Camden is expending its own funds or funds it administers in accordance with the terms of the grant is certainly a factor—***perhaps the crucial factor***—to be considered" in evaluating the ordinance's constitutionality. *Id.* at 221 (emphasis added).

It would therefore be premature to dismiss the City's claims at this stage based on the alleged unconstitutionality of either the Chicago Residency Ordinance or the Chicago Business Preference. Whether the City's ordinances are animated (and sufficiently justified) by a "substantial reason" for distinguishing between City and non-City residents and businesses is a "fact-intensive inquiry that cannot be resolved on a motion to dismiss—there have been no finding of facts made in this case, nor has there been any discovery and no declarations have been filed by anyone." *Metro. Wash. Chapter v. Dist. of Columbia*, 57 F. Supp. 3d 1, 25-26 (D.D.C. 2014); *cf. W.C.M. Window Co., Inc. v. Bernardi*, 730 F.2d 486, 498 (7th Cir. 1984) (concluding that a remand

for further factual development was not warranted because the "state had a full opportunity in the preliminary-injunction proceeding in the district court to put into evidence (or ask the court to take judicial notice of) facts justifying the preference law"); *Mescall v. Burrus*, 603 F.2d 1266, 1269 (7th Cir. 1979) (reversing district court's dismissal of one count because "certain findings of fact were made beyond the allegations of the complaint" and several issues relevant to the constitutional challenge required "determination[s] . . . which cannot factually be justified upon the motion to dismiss").

    2.  <u>Chicago's Municipal False Claims Ordinance Is Within Its Home Rule Authority and Is Not Preempted by the State False Claims Act Statute.</u>

The defendants also argue that the City does not have the constitutional authority to promulgate its municipal false claims ordinance, MCC § 1-22-010, under the Illinois Constitution's home rule provisions, or, alternatively, that the Illinois False Claims Act preempts the City's ordinance. Neither argument is persuasive. First, as a home rule unit, the City "may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a). The defendants argue that home rule units primarily have license to act on issues of local concern, and "subjects where the state has 'a vital interest and a traditionally exclusive role' are off-limits to local government control." Defs.' Memo. Supp. 6-7, ECF No. 60. And they point to the state's "extensive whistleblower regulatory regime and several consumer fraud statutes" as evidence of the state's allegedly "dominant interest in investigating and enforcing whistleblower actions within the state," that, in their view, supersedes the City's interest in protecting itself against false claims.

But the enactment of the municipal false claims ordinance falls squarely within the City's home rule authority. The Illinois Constitution instructs that the "[p]owers and functions of home

rule units shall be construed liberally." Ill. Const. 1970, art. VII, § 6(m). And the Illinois Supreme

Court has held that "[a]n ordinance pertains to the government and affairs of a home rule unit

where the ordinance relates to problems that are local in nature rather than State or national." *Vill.*

*of Bolingbrook v. Citizens Utils. Co. of Ill.*, 632 N.E.2d 1000, 1002 (Ill. 1994). The Chicago false

claims ordinance does not purport to address issues beyond the City's borders—as the plaintiffs

note, the ordinance's scope "is limited to false claims perpetrated against the City, in connection

with City contracts, and involving City funds." Pls.' Resp' Opp'n 6, ECF No. 69. And the

defendants' own briefing undermines the notion that the "state has a . . . traditionally exclusive

role" in the litigation of false claims submitted to local governments—before 1996, local entities

were, by definition, excluded from the Illinois False Claims Act's coverage, and until 2008,

municipalities could choose to forego the IFCA's protection. Defs.' Memo. Supp. at 9. Until 1996,

then, the State had no interest in pursuing false claims made to local governments, and until 2008,

the State's interest in pursuing municipal false claims stemmed from a local government's decision

to turn over responsibility for litigating those cases to the State. And nothing the defendants point

to suggests that false claims are a statewide problem necessitating a uniform, statewide solution,

or a subject that is "off-limits to local government control." Defs.' Memo. Supp. at 7. The mere

fact that the State is also "interested and . . . active in the area" does not preclude home rule units

from "carry[ing] on activities that relate to their communities." *City of Chicago v. StubHub, Inc.*,

979 N.E.2d 844, 851 (Ill. 2011) (citation omitted). To the contrary—the Illinois Constitution

expressly permits home rule units to "exercise and perform concurrently with the State" any power

or function valid under home rule "to the extent that the General Assembly by law does not

specifically limit . . . or specifically declare the State's exercise to be exclusive." Ill. Const. 1970,

art. VII, § 6(i). For years, the State and the City have done just that: the City has dealt with false

claims concerning City contracts or funds, and the State has dealt with false claims submitted to state agencies or subdivisions and also assisted municipalities that, unlike Chicago, do not have the resources or the interest in dealing with the issue locally.

Even if the regulation of false claims is within the City's home rule authority, the defendants argue, the IFCA, in its current form, preempts Chicago's ordinance. Defs.' Memo. Supp. at 8-9. As of 2008, the IFCA defines "State" to include "the State of Illinois; any agency of State government; [and] . . . any . . . municipality, municipal corporation, [or] unit of local government." 740 ILCS 175/2. The defendants characterize the statute's current definition as evincing the legislature's clear, express intent that the State be responsible for enforcing false claims submitted not only to state agencies, but to municipalities like Chicago, as well. Defs.' Memo. Supp. at 9. And allowing Chicago to maintain its own municipal false claims ordinance, they argue, would undermine "one of the most important aspects" of the IFCA: the State Attorney General's ability to control the litigation. *Id.* at 10. Because the City and the State Attorney General cannot simultaneously have complete control over litigation regarding false claims submitted to the city, the defendants insist that the ordinance is preempted. *Compare, e.g.*, 740 ILCS § 175/4(b)(1) (allowing dismissal of an IFCA action only with the Attorney General's written consent), *with* MCC 1-22-030(b)(1) (allowing dismissal of an action under the ordinance only with the corporation counsel's written consent).

But the IFCA does not expressly or impliedly preempt the City's false claim ordinances. The defendants admit, as they must, that "the IFCA lacks an express preemption clause." Defs.' Memo. Supp. at 11. And their argument that, express language aside, the Illinois General Assembly has "clearly expressed its intent" for the State to fully occupy the field of the litigation of false claims falls flat—when the General Assembly wants to "clearly express its intent," it knows how

to do so. In fact, it did so on the same day that the General Assembly amended the IFCA to remove the pre-2008 opt-in clause. In the same bill as the amendments to the IFCA, the General Assembly amended Illinois's Whistleblower Act to add a new "Home Rule Limitation" section, 740 ILCS 174/40, which expressly states that "[i]t is the public policy of this State . . . that the provisions of this Act are the exclusive exercise by the State of powers and functions which might otherwise be exercised by other home rule units" and that "[s]uch powers and functions may not be exercised concurrently" directly or indirectly by any unit of local government, including home rule units, except as otherwise authorized. *See* Pub. Act. 95-0128, § 5 (eff. Jan. 1, 2008). That the General Assembly did not insert identical language into the IFCA seriously (if not fatally) undermines the defendants' contention that the General Assembly had a clear intent to preempt the City's ability to litigate false claims cases under its own ordinance through the 2008 amendment. *Cf. Scadron v. City of Des Plaines*, 606 N.E.2d 1154, 1163 (Ill. 1992) ("'[A] statute intended to limit or deny home rule powers must contain an express statement to that effect.' . . . [U]nless a State law *specifically* states that a home rule unit's power is limited, then the authority of a home rule unit to act concurrently with the State cannot be considered restricted.") (citation omitted).

The defendants' argument for implied preemption fares no better. The Illinois Supreme Court has commented that the "purpose of section 6(i) [of the Illinois Constitution] is to eliminate or at least reduce to a bare minimum the circumstances under which local home rule powers are preempted by judicial interpretation of unexpressed legislative intent." *Scadron*, 606 N.E.2d at 1163 (internal quotations and citation omitted). The defendants nonetheless urge that, by investing in the State "primary responsibility for prosecuting the action," the very structure of the IFCA impliedly preempts Chicago's municipal false claims ordinance—"the state's interest is destroyed . . . if cities . . . can bring their own actions for claims identical to the ones authorized

Case: 1:17-cv-03062 Document #: 104 Filed: 02/07/22 Page 49 of 57 PageID #:6383

by the IFCA." Defs.' Memo. Supp. at 10. But the defendants' parsing of the statute's language is not enough to surmount the high threshold for demonstrating implied preemption. It is true that under the IFCA, "the 'State' has the primary responsibility for conducting a *qui tam* action and maintains the authority to dismiss a case despite a relator's objections," but given the amended definition of "State," "logic dictates that the defrauded government unit retains the decision-making power regarding the fate of a case." *Lyons Twp. ex rel. Kielczynski v. Vill. of Indian Head Park*, 84 N.E.2d 1118, 1123 (Ill. App. Ct. 2017). And the Illinois Supreme Court's emphasis in previous cases on the "Attorney General's constitutional role as the chief legal officer of the state" and the statute's provision providing that the Attorney General "in all circumstances effectively maintains control over the litigation" was not to settle a power struggle between the City's corporation counsel and the Attorney General over responsibility for false claims litigation, but to support its conclusion that the IFCA's *qui tam* provision does not usurp the Attorney General's exclusive authority to represent the state in litigation. *Scachitti v. UBS Fin. Servs.*, 831 N.E.2d 544, 561 (Ill. 2005). That the State did not intervene to protect its own interest in this case (or in any other, presumably, as no such case was cited in the defendants' brief) further indicates that the defendants' structural concerns do not amount to implied preemption. And given the Attorney General's admission that "[i]n many instances . . . the Attorney General would not have known of these schemes to defraud the State" but for *qui tam* relators, it seems the City's investigation and prosecution of its own false claims act cases would be, and is, considered an appropriate and welcome use of the City's expansive home rule authority. *Id.* at 561.[4]

---

[4] The supplemental authority (in the form of a "Statement of Interest" filed by the Illinois Attorney General in a state false claims case) offered by the defendants (ECF No. 101) to support its argument that the City cannot maintain an enforcement action under its own false claims ordinance where the state is pursuing the same claims under the ICFA adds no support for the defendants' argument. The Attorney General's Statement of Interest merely confirmed points that

3. <u>The City Has a Cause of Action under the Municipal Consumer Fraud Ordinance</u>

The defendants also deride the inclusion of the City's consumer fraud and deceptive practices claims as both non-meritorious and proof of the "City's kitchen-sink pleading approach." Defs.' Memo. Supp. at 31. The defendants challenge the City's cause of action on various grounds: that the City is not a "person" capable of bringing suit under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (ICFA); that the City is not a "consumer" protected by the ICFA, according to 815 ILCS 505/1(e); that the City's CFA claim duplicates its breach of contract claim; and that the complaint does not satisfy Rule 9(b)'s particularity requirement for fraud claims. *Id.* at 31-32. The defendants argue that, as a result, the City's consumer fraud claim under the municipal code, MCC § 2-25-090, cannot be sustained either— they argue that the ordinance "does not contain an alternate, more expansive definition of 'person' or 'consumer'" and that "the City cannot bring a municipal ordinance claim for itself." *Id.* at 32-33. Finally, they argue that, even if the City can bring a claim under the municipal code on its own behalf, it did not follow the ordinance's requirements like "14-day notice" before certain investigatory acts, nor did it "complete an investigation pursuant to this section." *Id.*

To the extent that the City's complaint purports to raise a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, however, the defendants' motion to dismiss is granted.[5] As the defendants note, the City is not a "person" authorized to bring an action for actual

---

the plaintiffs do not dispute, namely that the state controls claims asserted under the ICFA. The Attorney General's Statement did not raise, much less opine on, the authority of a home rule unit to press its own claims under its own ordinance.

[5] The City maintains that its complaint "does not attempt to state a claim under the ICFA." Pls.' Resp. Opp'n at 33. But the defendants' confusion is understandable—the City's complaint alleges "violations of MCC § 2-25-090, *et seq.*, and 815 ILCS 505/2" in Count III. City Compl. at 18-19, ¶ 126.

damages under the state statute. *See* 815 ILCS 505/10a(a) (authorizing "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person" to "bring any action against such person" for actual economic damages or other relief); *Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 546 N.E.2d 580, 598-99 (Ill. 1989) (holding that a body politic is not a "person" or "corporation" as used in the Consumer Fraud Act).

But as the City notes, Count III of its complaint asserts a claim for violation of the ordinance, not (only) the ICFA, and that the City lacks authority to bring a deceptive business practice claim under the ICFA does not bear on its ability to bring a claim under MCC § 2-25-090. It's true that the ordinance instructs that "consideration shall be given to court interpretations relating to the Illinois Consumer Fraud and Deceptive Business Practices Act" in construing its provisions. MCC § 2-25-090(a). But, just as the ICFA does for the Attorney General, the ordinance expressly authorizes corporation counsel to bring an action on the City's behalf against individuals who have engaged in business practices prohibited by the section. *Compare id.* § 2-25-090(f)(4), *with* 815 ILCS 505/7. [6] That the City could not bring the same claim under the ICFA is irrelevant. *See* Pls.' Resp. Opp'n Ex. A (*City of Chicago ex rel. Foxx v. Uber Techs.*, No. 17 CH 15594, at 2-3 (Ill. Cir. Ct. July 16, 2018) ("The City may properly pursue claims under the Ordinance regardless of whether it could assert independent claims under the ICFA or PIPA.")).

---

[6] The City seeks restitution, disgorgement, and the imposition of a $10,000 civil penalty per violation per each day the violation occurred. The parties do not address, however, whether the City is limited in the type of relief it is entitled to seek under the consumer fraud ordinance, in light of the language authorizing corporation counsel to "bring an action for injunctive relief or other such equitable relief that the commissioner deems to be appropriate." MCC § 2-25-090(f)(4); *compare* 815 ILCS 505/7(b) (expressly authorizing the Attorney General to request that a court impose a civil penalty up to $50,000 per violation). Because the issue is not briefed, the Court does not decide it here.

Further, the defendants' conclusion that the City's interests cannot be vindicated under the state statute or municipal ordinance is incorrect. To bring an ICFA claim, "a plaintiff must either: (1) be a 'consumer,' or, (2) if a non-consumer, satisfy the 'consumer nexus' test, which requires the plaintiff to 'have suffered damages resulting from conduct that is either directed toward the market or otherwise implicates consumer protection concerns.'" *Tile Unlimited, Inc. v. Blanke Corp.*, 788 F. Supp.2d 734, 738 (N.D. Ill. 2011). The defendants argue that the City is not a consumer and cannot otherwise satisfy the consumer nexus test, as "the City's complaint is about conduct directed at it—not the 'market'—and does not otherwise implicate 'consumer protection concerns.'" Defs.' Memo. Supp. at 32. But whether the City is a "consumer" is, again, the wrong question; the issue is whether an entity with standing may bring an action based on deceptive business practices targeting the City. And on that question, the answer is clear: yes. *Cf. People ex rel. Hartigan v. E&E Hauling, Inc.*, 607 N.E.2d 165, 172 (Ill. 1992) (allowing the Attorney General to bring construction contract-based ICFA claims arising from the defendants' contract with the Metropolitan Fair and Exposition Authority, because "[u]nder section 7 [of the ICFA], the Attorney General is not limited in regard to whose interests he may seek to protect under the Act" and "[n]othing in section 7 indicates that the defrauded party must be a consumer or 'person' in order for the Attorney General to have standing"); *People ex rel. Daley v. Datacom Sys. Corp.*, 585 N.E.2d 51, 65 (Ill. 1992) ("A person's status as a consumer relates to his or her standing as an individual under the Consumer Fraud Act, but it is irrelevant in a case, like the one at bar, which is brought by the State's Attorney."). *See also* Pl.'s Resp. Opp'n Ex. B (*City of Chicago v. Mason*, No. 17 L 5477, at 4 (Ill. Cir. Ct. Feb. 16, 2018) (denying a motion to dismiss the City's claim under MCC § 2-25-080(a) because, to bring such a claim, the City "does not need to be a person, or a consumer")).

The defendants' remaining statutory challenge to the City's municipal consumer fraud claim is that "the City has not satisfied any of the requirements of the ordinance itself before bringing suit." Defs.' Memo. Supp. at 33. The defendants note, for example, that the City's complaint does not indicate that the commission undertook an investigation pursuant to § 2-25-090(f) or that the defendants received fourteen days' notice before certain investigatory actions were taken, pursuant to § 2-25-090(d). *Id.* This exhaustion argument is a non-starter. Neither of the supposed requirements in the municipal ordinance even remotely resemble the type of "prescribed administrative remedy" at issue in the defendants' cited cases, such that a failure to comply with the ordinance's requirements would render the City unable to seek relief under it. *See, e.g.*, *Adams v. City of Chicago*, 491 F. Supp. 1257, 1259 (N.D. Ill. 1980) (describing the plaintiffs' failure to avail themselves of the Comprehensive Employment and Training Act's administrative grievance procedure before seeking judicial relief). The fourteen-day notice requirement in § 2-25-090 is only applicable, for example, if the commissioner wants to examine a person, merchandise, or business records and other documents; retain copies of those documents; or request a written statement regarding allegations of consumer fraud or deceptive business practices. But the commissioner is not required to take any of those steps—the ordinance states that the commissioner may (with proper notice) take those actions, not that the commissioner must. MCC § 2-25-090(d) (if, based on a complaint or otherwise, it appears that a person has engaged in, is currently engaged in, or is about to engage in a prohibited practice, "the commissioner *may*, after serving a 14-day notice" take certain investigatory actions) (emphasis added).[7] No more

---

[7] Though not dispositive to the Court's analysis, it bears noting that the defendants neither indicate that the Commissioner actually took any of the investigatory actions subject to the fourteen-day notice requirement nor that, if the commissioner did take such action, that JKCC did not receive proper notice.

convincing is the defendants' insistence that "the City's complaint is devoid of any suggestion that the Commissioner conducted or completed any investigation" indicates an attempt to "circumvent" a "notice, investigative, and administrative process" described in the ordinance. Defs.' Memo. Supp. at 33. Again, it's notable that the defendants' focus is on the City's failure to adequately plead that there was an investigation, rather than whether an investigation actually occurred—and disputing that would be a frivolous argument, in light of the multiple requests for extension from the United States, with the assent of the state and the City, for the express purpose of investigating Milazzo's claims. *See, e.g.*, Sealed Mot., ECF No. 10 (the United States' second motion for an extension to continue investigating the relator's claims); City's Notice of Intervention in Part, ECF No. 13 (filed more than two years after Milazzo's initial complaint alerted the City of the allegedly fraudulent scheme). Moreover, the motivating concerns that led to the doctrine of administrative exhaustion—cutting down on the work of courts, preserving the integrity and autonomy of administrative processes, and ensuring that a court has "before it the mature, considered, and final articulation of the basis of the agency's action"—are not applicable here, and certainly do not warrant dismissing the City's claim. *See Glisson v. U.S. Forest Serv.*, 55 F.3d 1325, 1327 (7th Cir. 1995). For the reasons described in the City's complaint, it believes that JKCC and Kennedy engaged in the type of deceptive business practices prohibited by the ordinance. Based on that belief, it could have taken any one of various courses of action, including asking corporation counsel to commence an action for certain forms of relief. That's what the City has done, and there is no basis for dismissing the City's claim based on a failure to investigate (especially in light of the investigation which may be inferred from the City's allegations) or its failure to give notice that it took particular discretionary actions.

Finally, the defendants offer two more bases they believe warrant dismissal of the City's claim under MCC § 2-25-090: first, that the claim "duplicates the City's breach of contract claim," and second, that the City's complaint "does not satisfy Rule 9(b)'s pleading requirements." Defs.' Memo. Supp. at 32. Neither is persuasive. The gist of both points is the same: the city's consumer ordinance duplicates the city's breach of contract claim because it fails to adequately allege fraud. The defendants are correct that "[a] breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005). But the City has alleged more than the defendants' mere "failure to fulfill their contractual obligations"—the City's claim is not predicated on JKCC's failure to comply with the contractual residency requirements, but on the defendants' scheme to obscure their noncompliance through the submission of false or incomplete payroll certifications. *Compare Dyson, Inc. v. Syncreon Tech. (America), Inc.*, No. 17 C 6285, 2019 WL 3037075, at *5 (N.D. Ill. July 11, 2019) (holding that plaintiff's allegations that the defendant "induced it to enter the contract by misrepresenting its experience in retail logistics and its existing technological capacity" did not duplicate the plaintiff's breach of contract claim, because the allegations went "beyond [the defendant's] unfulfilled promise to perform its contractual obligations"); *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) ("When allegations of consumer fraud arise in a contractual setting, the plaintiff must prove that the defendant engaged in deceptive acts or practices distinct from any underlying breach of contract."). In so pleading, the City has alleged the "something more" that distinguishes its claim under MCC § 2-25-090 from "garden-variety breach of contract." *Greenberger*, 631 F.3d at 399. And the defendants' Rule 9(b) argument as to the City's description of the allegedly fraudulent conduct is weak: the City has alleged, in detail, how it believes JKCC carried out the alleged CRO fraud, specific JKCC employees that it believes

55

were involved in the scheme, and the contracts it believes were affected by JKCC's conduct. At this stage, the City has pleaded fraud with the requisite particularity

*　　　*　　　*

In sum, the defendants' motion to dismiss is granted in part and denied in part. The plaintiffs' presentment and false statement claims fail; Milazzo and the City have failed to adequately plead that JKCC presented false claims or made or used a false record or statement material to a false claim. The defendants' motion, however, does not offer a developed argument as to why the plaintiffs' "reverse claims" theory fails under the false claims statutes and ordinance. Nevertheless, all of the claims asserted under the false claims statutes and ordinance fail because the plaintiffs have not adequately pleaded the materiality of the defendants' allegedly fraudulent misrepresentations regarding their compliance with the CRO or their eligibility for the Chicago Business Preference. With respect to Joel Kennedy individually, the City has failed to plead with adequate specificity Joel Kennedy's role in the allegedly fraudulent scheme to avoid the City's CRO requirements.

On those bases, the entirety of Milazzo's Second Amended Complaint and Counts I and II of the City's complaint are dismissed without prejudice. Because the plaintiffs have not had a prior opportunity to respond to the Court's assessment of the complaints and it is possible that additional pleading could cure the deficiencies noted by the Court, the dismissals are without prejudice and the plaintiffs will be given the opportunity to amend.

The defendants' motion to dismiss is denied as to Counts III and IV of the City's complaint. The Court cannot determine, as a matter of law, that the City's residency ordinance and business preference are unconstitutional at the motion to dismiss stage; as a result, the City's breach of contract claim survives. Finally, the defendants' argument that the City does not have a cause of

action under the municipal consumer fraud and deceptive business practices ordinance is unpersuasive, and so the City's claims under Count III against JKCC and Kennedy may proceed in a manner consistent with the Court's determination that the City has inadequately pleaded Kennedy's individual involvement in the CRO scheme.

Dated: February 7, 2022

John J. Tharp, Jr.
United States District Judge